LEE TRAN & LIANG LLP
James M. Lee (Bar No. 192301)
 james.lee@ltlattorneys.com
Danielle R. Claxton (Bar No. 272003)
 danielle.claxton@ltlattorneys.com
601 S. Figueroa Street, Suite 3900
Los Angeles, CA 90017
Telephone: 213-612-8900
Facsimile: 213-612-3773

Attorneys for Plaintiffs
VIZIO, Inc. and
AmTRAN Technology Co., Ltd.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIZIO, INC., a California corporation; AMTRAN TECHNOLOGY CO., LTD., a Taiwanese corporation,<br><br>Plaintiff,<br><br>v.<br><br>HDREPAIR.COM CORPORATION, a Florida corporation; HDREPAIR.COM SERVICES LLC, a Florida limited liability company; SYNERGY TECHNICAL SOLUTIONS CORPORATION doing business as SYNTECHS, a Florida corporation; CLARISSA ROXBERRY, an Individual; ROBERT ROXBERRY, an Individual; LOUIS WELTMAN, an Individual; and DOES 1 to 10,<br><br>Defendants. | CASE NO.: 8:15-cv-1894<br><br>**COMPLAINT**<br>(1) TRADEMARK INFRINGEMENT - 15 U.S.C. § 1114<br>(2) TRADEMARK INFRINGEMENT - 15 U.S.C. § 1125(a)<br>(3) MISAPPROPRIATION OF TRADE SECRETS - California Civil Code §§ 3426 *et seq.*<br>(4) CONVERSION<br>(5) LIBEL<br>(6) BREACH OF CONTRACT<br>(7) UNFAIR COMPETITION<br>(8) UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200 *et seq.*<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs VIZIO, Inc. ("VIZIO") and AmTRAN Technology Co., Ltd.

("AmTRAN") (collectively, "Plaintiffs") allege as follows:

## NATURE OF THE ACTION

1.     Plaintiffs VIZIO and AmTRAN initiate this action against Defendants HDRepair.com Corporation ("HDRepair"), HDRepair.com Services, LLC ("HDRepair Services"), Synergy Technical Solutions Corporation doing business as Syntechs ("Syntechs") Clarissa Roxberry, Robert Roxberry, and Louis Weltman to prevent Defendants from improperly utilizing VIZIO's confidential customer list for Defendants' improper benefit, to prevent Defendants from utilizing VIZIO's trademarks, and to compel Defendants to return property converted from Plaintiffs.

2.     VIZIO discovered that Defendants have been utilizing a list of VIZIO's customers to make annoying, harassing, and unauthorized telephone marketing calls to sell cable, internet, and/or satellite subscriptions.  Defendants reference VIZIO's trademarks in these sales calls to give the false impression that VIZIO sponsors, endorses, or approves of Defendants' improper activities.

## THE PARTIES

3.     VIZIO is a California corporation whose principal place of business is in Irvine, California.

4.     AmTRAN is organized under the laws of Taiwan, with its principal place of business in New Taipei City, Taiwan.

5.     Upon information and belief, Defendant HDRepair is a Florida corporation, with its principal place of business in Boca Raton, Florida.  Upon information and belief, HDRepair is engaged in the business of providing in-home television repair.  HDRepair also advertises that it is an "authorized dealer" for DirecTV, Excede Internet, Century Link, and AT&T, and that it sells bundles with cable, internet, and/or satellite subscriptions.

COMPLAINT

6.     Upon information and belief, Defendant HDRepair Services is a Florida limited liability company, with its principal place of business in Boca Raton, Florida.

7.     Upon information and belief, Defendant Syntechs is a Florida corporation, with its principal place of business in Boca Raton, Florida.

8.     Upon information and belief, Defendants HDRepair, HDRepair Services, and Syntechs share the same principal place of business, 6400 Park of Commerce Boulevard, Suite 1 Box 2, Boca Raton, FL 33487.

9.     Upon information and belief, Defendant Clarissa Roxberry, is a resident of Boca Raton, Florida, and a director and/or officer of Defendants HDRepair, HDRepair Services, and Syntechs.

10.    Upon information and belief, Defendant Robert Roxberry, is a resident of Boca Raton, Florida, and a director and/or officer of Defendants HDRepair, HDRepair Services, and Syntechs.

11.    Upon information and belief, Defendant Louis Weltman is a resident of Boca Raton, Florida, and a director and/or officer of Defendants HDRepair, HDRepair Services, and Syntechs.

12.    Upon information and belief, Defendants direct their business activities to California.  Defendants actively solicit business from and offer services to entities that are incorporated in California and/or have their headquarters in California, including DirecTV and Excede Internet (owned by Viasat, Inc.).

13.    The identities of DOE defendants 1 to 10 are not known to Plaintiffs at this time.  Plaintiffs will seek leave of this Court to amend this Complaint when the identities of these DOE defendants become known. Plaintiffs are informed and believe, and on that basis allege, that each of the DOE defendants is liable in whole or in part for the wrongful acts alleged in this Complaint.

14.    Upon information and belief, at all relevant times herein alleged, each of the DOE defendants conspired with, acted in concert with, and aided and abetted each other to commit the wrongs against Plaintiffs.  In doing so, at all relevant times,

COMPLAINT

each of the DOE defendants was the agent, servant, employee, principal, joint venturer, alter ego, and/or partner of one another.

15. Plaintiffs further allege upon information and belief that in performing the actions alleged in this Complaint, each DOE defendant was acting within the scope of actual or apparent authority conferred upon that defendant by consent, approval, and/or ratification of the others.

16. Upon information and belief, Defendants HDRepair, HDRepair Services, and Syntechs are alter egos of Defendants Clarissa Roxberry, Robert Roxberry, and Louis Weltman.  Plaintiffs are informed and believe that at all times, Defendants, and each of them, were and are under unity of ownership.

17. Upon information and belief, Ms. Roxberry, Mr. Roxberry, and Mr. Weltman have individually and collectively directed the improper conduct complained of herein.   They conspired with, acted in concert with, and aided and abetted each other to commit the wrongs against Plaintiffs.

## **JURISDICTION AND VENUE**

18. This court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338, for a civil action arising under the laws of the United States, specifically, the Lanham Act.   This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.  There is diversity of citizenship between Plaintiffs and Defendants.  The matter in controversy exceeds $75,000.  This Court has supplemental subject matter jurisdiction over the state and common law claims pursuant to 28 U.S.C. § 1367.

19. This Court has personal jurisdiction over HDRepair.

20. Venue is proper because, among other things, VIZIO is headquartered in Irvine, California within this District; the actions identified herein affect VIZIO and its operations within this District; the source of the confidential customer list

COMPLAINT

obtained and used by Defendants originated from VIZIO in this District; and the claims and injuries that are the subject of this action occurred in this District.

## GENERAL ALLEGATIONS

### VIZIO'S Relationship with AmTRAN

21.     VIZIO is a consumer electronics company, based in Irvine, California. Since VIZIO was founded in in 2002, VIZIO has built an industry-leading brand and sold over 65 million units, including televisions, sound bars and other devices. VIZIO uses its distinct name to distinguish itself from the competition and maintain its brand, reputation, and goodwill.  The VIZIO name and VIZIO symbols are trademarked.

22.     AmTRAN is an Original Design Manufacturer ("ODM").  AmTRAN designs and manufactures products and accessories for VIZIO, and provides repair and warranty support for those products.  AmTRAN contracts with other companies (such as Defendant HDRepair) to provide on-site warranty and repair services for VIZIO.  The terms and conditions of VIZIO's relationship with AmTRAN are stated in the *VIZIO Inc. Standard Supply Agreement* ("*Supply Agreement*").  A redacted copy of the *Supply Agreement* is attached hereto as Exhibit 1.

23.     If a VIZIO customer has a warranty or repair issue with a VIZIO product, the customer would ordinarily contact VIZIO by phone, email, or internet chat.  VIZIO attempts to troubleshoot the reported issue with the customer.  If the issue is not resolved, VIZIO escalates the issue to a company designated by AmTRAN as an "authorized service provider" to provide warranty and repair services.

24.     In reliance of contractual provisions whereby authorized support providers agree to keep VIZIO's customer lists and other information confidential, VIZIO contacts the designated authorized service provider and conveys information

COMPLAINT

that the parties understand to be confidential, including the customer's name, phone number(s), email address, address, and television model number and serial number (collectively, "Customer Information").  The VIZIO customer list that is the subject of this action contains Customer Information for VIZIO's customers.

25.    VIZIO considers its customer lists to be confidential and takes extensive measures to protect this information.  Customer Information is disclosed to authorized service providers on a need-to-know basis and for the sole purpose of repairing VIZIO products.

### HDRepair is an Authorized Service Provider for VIZIO Pursuant to HDRepair's Agreement with AmTRAN

26.    Effective January 15, 2009, AmTRAN and one of its subsidiaries, ASEV Display Labs, Inc. ("ASEV"), entered into the *Maintenance Service Agreement* ("*Maintenance Agreement*") with HDRepair.  AmTRAN and ASEV agreed to engage HDRepair to provide maintenance services for VIZIO televisions as an authorized service provider.  A true and correct copy of the *Maintenance Agreement* is attached hereto as Exhibit 2.

27.    VIZIO granted AmTRAN a license to use VIZIO's trademarks.  (Ex. 1, Section 9.1(b)-(c).)  AmTRAN, in turn, granted a limited license to HDRepair to use VIZIO's trademarks for the sole purpose of providing warranty and repair services. Specifically, AmTRAN granted HDRepair the right to display or use the VIZIO name, trademarks, service marks, logos, trade dress, and other intellectual property rights (collectively, the "Marks").  HDRepair agreed to discontinue use of the Marks if requested, and agreed that Marks may only be used for HDRepair to provide repair and warranty services on VIZIO products.  (Ex. 2, Section 5.)  HDRepair "acknowledge[d] that VIZIO, as the owner of the Marks, shall have the exclusive right, title and interest in and to any and all common law trademarks and registration

COMPLAINT

rights arising out of the use by HDREPAIR of the Marks under this Agreement." (*Id.* at Section 5(d).)

28.     HDRepair also acknowledged that it "will obtain secret and confidential information concerning the business of [AmTRAN and ASEV] and its affiliates, including, without limitation, trade secrets, . . . client lists, . . . (the 'Confidential Information')."  (Ex. 2, Section 13(a).)  HDRepair agreed that it will not use Confidential Information for its own purposes or for the benefit of any other person, firm, or entity.  (*Id.* at Section 13(c).)

29.     HDRepair agreed that "Customer names and trademarks are proprietary and may not be used for any purpose without the specific permission of the trademark owners."  (Ex. 2, Exhibit A, A-4.)   HDRepair's technicians are prohibited from soliciting VIZIO's customers for additional services.  (*Id.*)

30.     In consideration of the services provided by HDRepair, AmTRAN and ASEV agreed to pay HDRepair specified fees. (Ex. 2, Section 3.)

31.     Lastly, to service VIZIO's products, HDRepair was required to use parts supplied by AmTRAN and ASEV.  The parts inventory was not HDRepair's property nor does HDRepair have the right to control or possess the parts inventory. HDRepair must comply with AmTRAN and ASEV's policies and procedures regarding the return of the parts inventory.  (Ex. 2, Section 1(d).)

**Syntechs Stopped Paying the Technicians Who Performed Warranty and Repair Services on Behalf of HDRepair**

32.     Upon information and belief, Defendants Ms. Roxberry, Mr. Roxberry, and Mr. Weltman directed, instructed, or caused Syntechs to retain technicians to provide warranty and repair services to VIZIO's customers on behalf of HDRepair. These technicians were independent contractors who worked on behalf of HDRepair but were paid by Syntechs.

COMPLAINT

33.   Plaintiffs are informed and believe that after HDRepair collected payment for the work performed by the technicians, neither HDRepair nor Syntechs paid the technicians.  Instead, HDRepair kept the money and/or transferred the money to the other Defendants.  Plaintiffs are informed and believe that Ms. Roxberry, Mr. Roxberry, and Mr. Weltman will cause Syntechs to file for bankruptcy protection to avoid paying the technicians.  Plaintiffs are informed and believe that as of the date of this filing, Syntechs owes these technicians a total of approximately 1.4 million dollars.

**Defendants Exploited and Continue to Exploit VIZIO's Confidential Information, Reputation, and Goodwill for Monetary Gain**

34.   HDRepair either itself and/or through HDRepair Services, Syntechs, Ms. Roxberry, Mr. Roxberry, or Mr. Weltman began a scheme to distribute VIZIO's customer list among themselves.

35.   Defendants' plan was to monetize and leverage HDRepair's affiliation with VIZIO to sell services and products.  Trading on VIZIO's reputation and goodwill in the consumer electronics industry, Defendants called and continue to call VIZIO's customers to market cable, internet, and/or satellite subscriptions.  Plaintiffs are informed and believe that HDRepair will profit if VIZIO's customers purchase the subscriptions through HDRepair.  HDRepair purports to sell cable, internet, and satellite subscriptions as an "authorized dealer" for DirecTV, Excede Internet, CenturyLink, and AT&T.

36.   Defendants begin the telephone pitch to VIZIO's customers by mentioning HDRepair's recent repair or warranty work on the customer's VIZIO television.  Defendants then attempt to sell cable, satellite, and/or internet subscriptions.

37.   VIZIO first learned that Defendants solicited VIZIO's customers in July 2015, when VIZIO received a complaint from a customer.

COMPLAINT

38.     Because Defendants began the calls by referencing VIZIO and HDRepair's maintenance of the customer's VIZIO television, VIZIO's customers were led to believe that VIZIO caused them to be the target of Defendants' annoying and harassing sales campaign.

39.     On or about August 1, 2015, VIZIO's Vice President of Support, Scott Patten, and Defendant Robert Roxberry had a telephone conference.  Mr. Roxberry, speaking on behalf of HDRepair, agreed that HDRepair would stop soliciting VIZIO's customers.

40.     On September 25, 2015, AmTRAN notified HDRepair of the termination of the *Maintenance Agreement*.

41.     On or about October 16, 2015, VIZIO received additional customer complaints.  One customer publically complained about the solicitation calls on Twitter using VIZIO's Twitter handle, @*VIZIO*.

42.     The complaints made by VIZIO's customers are similar.  They reported that someone called them multiple times on all of their phone numbers, referenced HDRepair's service of their VIZIO television, and tried to sell them cable, internet, and/or satellite subscriptions.  One customer told the HDRepair representative to stop calling.  Refusing to respect this customer's wishes, Defendants repeatedly called the customer to sell services.

43.     On or about October 16, 2015, VIZIO sent HDRepair a letter demanding that HDRepair cease and desist its activities.

44.     On or about October 20, 2015, VIZIO representatives Mr. Patten and Rob Brinkman (Chief Administrative Officer) had a telephone conversation with Defendant Weltman.  Mr. Patten and Mr. Brinkman asked Mr. Weltman to cause Defendants to cease and desist their unauthorized use of VIZIO's Marks and customer list in Defendants' telephone solicitations.

45.     Mr. Weltman refused, citing a lack of payment to HDRepair by AmTRAN and ASEV.  Although Mr. Weltman acknowledged that VIZIO does not

COMPLAINT

1   have any contractual responsibility to pay HDRepair, he threatened that HDRepair

2   would continue to use VIZIO's customer list and Marks until VIZIO intervened and

3   forced AmTRAN and ASEV to provide full payment to HDRepair.

4        46.   Mr. Weltman also admitted that Syntechs had not paid its technicians

5   for some time.  Although VIZIO does not employ these technicians and has no

6   relationship with them, Mr. Patten and Mr. Brinkman insisted to Mr. Weltman that

7   the technicians must be paid.  Mr. Weltman replied that any demand for HDRepair to

8   compensate the technicians "is a non-starter."  Rather, Mr. Weltman hinted that the

9   technicians would not receive full compensation for work performed, even if

10  HDRepair received payment for that work.  Mr. Weltman bragged that he is a

11  bankruptcy expert and suggested that he would cause Syntechs to file for bankruptcy

12  to discharge its debts to the technicians.  The technicians, who are believed to be

13  owned as much as 1.4 million dollars, would not receive any payment.

14       47.   Mr. Weltman then suggested that HDRepair would: (1) stop its practice

15  of making unwanted and unauthorized solicitation calls to VIZIO's customers; and

16  (2) return Plaintiffs' parts inventory if VIZIO caused AmTRAN and ASEV to pay

17  $630,000 in receivables to HDRepair, and *not* to Syntechs.  Mr. Weltman demanded

18  that VIZIO agree to these conditions before Mr. Weltman would instruct HDRepair

19  principals, Mr. and Mrs. Roxberry to stop Defendants' unlawful conduct.

20       48.   Mr. Weltman's demand revealed Defendants' scheme to engage in

21  bankruptcy fraud.  Upon information and belief, Defendants' scheme is to have

22  HDRepair collect $630,000 from VIZIO and/or AmTRAN under the guise that the

23  money will be used to pay the technicians who performed the repair and warranty

24  services on VIZIO televisions.  After collecting $630,000, Defendants will bankrupt

25  Syntechs to discharge the 1.4 million dollar debt, which includes Syntechs' debt to

26  the technicians.  By doing this, Defendants will profit $630,000 from their scheme,

27  and will prevent the technicians from receiving pay owed to them.

28

COMPLAINT

**Mr. Weltman Accused VIZIO of Causing Syntechs' Debt**

49.    Upon information and belief, on or about October 22, 2015, Mr. Weltman sent an email to Syntechs technicians.  He blamed VIZIO for Syntechs' "continuing operating losses," citing a "staged reduction in pricing and territory related to [Syntechs'] relationship with Vizio and Vizio's manufacturer partners." The email stated that "continuing changes imposed upon [Syntechs] by Vizio and its partners led to slower payments. Ultimately, this led to the recent total loss of this business and resulted in the outstanding obligations to you."  The email again insinuated that VIZIO prevented or somehow caused Syntechs to default on its payment to technicians: "Besides the above update, you are receiving this email because it is my understanding that each of you is a service provider to Syntechs and is owed money in connection with warranty services provided by you to purchasers of Vizio products."

50.    In a letter dated October 23, 2015, VIZIO informed Defendants that HDRepair's alleged payment disputes do not provide a valid or legal basis for Defendants' misappropriation and improper use of VIZIO's customer list or Marks, or HDRepair's retention of the parts inventory.

51.    On or about October 26, 2015, VIZIO received an additional customer complaint.  Someone called the customer, referenced HDRepair's service of the customer's VIZIO television, and tried to sell the customer DirecTV service.

52.    On or about October 28, 2015, Mr. Weltman explicitly informed VIZIO that Defendants will not stop making the unauthorized sales calls.

53.    Defendants refuse to cease and desist or return the parts inventory. Plaintiffs file this action and seek injunctive relief, a return of the parts inventory, and related damages.

COMPLAINT

## FIRST CLAIM FOR RELIEF

Trademark Infringement - 15 U.S.C. § 1114

By VIZIO against All Defendants

54. VIZIO realleges the allegations in the preceding paragraphs as if fully set forth herein.

55. VIZIO owns trademark registrations. The VIZIO Marks cover a range of consumer electronics, including flat-screen televisions, speakers, and other audio, video, and consumer-electronic products and accessories. In the United Sates, VIZIO is the owner of the following registered trademarks: U.S. Registration Nos. 3235417, 3793660, 3796179, 3835959, 4053025, 4369035, 4388491, 4392676, and 4621356. Multiple affidavits have been filed pursuant to Sections 8 and 15 of the Lanham Act, 15 U.S.C. §§ 1058 and 1065, for certain registrations referenced above, and accordingly, those registrations are incontestable.

56. The Marks are inherently distinctive to the consuming public. As a result of VIZIO's longstanding use and promotion of the Marks, as reflected in its incontestable trademark registrations, the consuming public and trade recognize and associate the Marks with VIZIO. The Marks have acquired a high degree of public recognition and distinctiveness as a symbol of the source of high-quality products offered by VIZIO. The Marks embody a valuable reputation and goodwill belonging exclusively to VIZIO.

57. VIZIO granted to AmTRAN a license to use the VIZIO Marks. AmTRAN granted a license to HDRepair to use the Marks only in connection with servicing VIZIO televisions as an authorized service provider. HDRepair is not permitted to use the Marks for any other purpose. (Ex. 2, Section 5.) Neither AmTRAN nor VIZIO granted HDRepair the authority, permission, or license to use the Marks in Defendants' attempts to sell cable, internet, and/or satellite services. Neither AmTRAN nor VIZIO granted HDRepair Services, Syntechs, Ms. Roxberry, Mr. Roxberry, or Mr. Weltman the authority, permission, or license to use the Marks.

COMPLAINT

58.     Without VIZIO's or AmTRAN's consent, Defendants used and continue to use the Marks to sell cable, internet, and satellite subscriptions to VIZIO's customers in a manner likely to cause confusion, mistake, or deception.

59.     Defendants' infringement of the Marks was and is willful.

60.     Defendants' wrongful activities caused and continue to cause VIZIO to suffer irreparable injury.

61.     VIZIO is informed and believes that unless said conduct is enjoined by this Court, Defendants will continue to expand their activities and cause further continued and irreparable injury to VIZIO.  This injury includes damage to VIZIO's brand, reputation, and customer goodwill.  This injury cannot be remedied through damages, and VIZIO has no adequate remedy at law.

62.     VIZIO is entitled to preliminary and permanent injunctions, pursuant to 15 U.S.C. § 1116, restraining and enjoining Defendants and their agents, servants, employees, and all persons acting thereunder, in concert with, or on their behalf, from using the Marks, digitally or otherwise, to market services or products without VIZIO's consent.

63.     VIZIO is entitled to recover pursuant to 15 U.S.C. § 1117: (a) any profits realized by Defendants; (b) VIZIO's ascertainable damages; and (c) VIZIO's costs of suit.  Defendants' willful conduct, without excuse or justification, renders this an exceptional case and entitles VIZIO to reasonable attorney's fees.

## SECOND CLAIM FOR RELIEF

### Trademark Infringement - 15 U.S.C. § 1125(a)

### By VIZIO against All Defendants

64.     VIZIO realleges the allegations in the preceding paragraphs as if fully set forth herein.

65.     VIZIO owns trademark registrations.  The VIZIO Marks cover a range of consumer electronics, including flat-screen televisions, speakers, and other audio,

COMPLAINT

video, and consumer-electronic products and accessories.  In the United Sates, VIZIO
is the owner of the following registered trademarks: U.S. Registration Nos. 3235417,
3793660, 3796179, 3835959, 4053025, 4369035, 4388491, 4392676, and 4621356.
Multiple affidavits have been filed pursuant to Sections 8 and 15 of the Lanham Act,
15 U.S.C. §§ 1058 and 1065, for certain registrations referenced above, and
accordingly, those registrations are incontestable.

66.     The Marks are inherently distinctive to the consuming public.  As a result
of VIZIO's longstanding use and promotion of the Marks, as reflected in its
incontestable trademark registrations, the consuming public and trade recognize and
associate the Marks with VIZIO.  The Marks have acquired a high degree of public
recognition and distinctiveness as a symbol of the source of high-quality products
offered by VIZIO.  The Marks embody a valuable reputation and goodwill belonging
exclusively to VIZIO.

67.     VIZIO operates under and uses the Marks in connection with its products
and services.

68.     VIZIO granted to AmTRAN a license to use the VIZIO Marks.
AmTRAN granted a license to HDRepair to use the Marks only in connection with
servicing VIZIO televisions as an authorized service provider.  HDRepair is not
permitted to use the Marks for any other purpose.   (Ex. 2, Section 5.)  Neither
AmTRAN nor VIZIO granted HDRepair the authority, permission, or license to use
the Marks in Defendants' attempts to sell cable, internet, and/or satellite services.
Neither AmTRAN nor VIZIO granted HDRepair Services, Syntechs, Ms. Roxberry,
Mr. Roxberry, or Mr. Weltman the authority, permission, or license to use the Marks.

69.     Defendants made and continue to make commercial use of the Marks.

70.     Defendants falsely used and continue to use the Marks in conjunction
with targeted person-to-person solicitations to sell internet, cable, and/or satellite
services.  Defendants specifically target VIZIO customers for whom HDRepair
performed warranty service on VIZIO televisions.  Defendants' practice was intended

COMPLAINT

1  to and did cause confusion, mistake, or deception as to (a) VIZIO's affiliation,

2  connection, or association with services marketed by Defendants; (b) VIZIO's origin,

3  sponsorship, or approval of the services marketed by Defendants; and/or (c) VIZIO's

4  sponsorship or approval of Defendants' targeted marketing calls to VIZIO's

5  customers.

6  71.  By virtue of Defendants' use of the VIZIO Marks to market HDRepair's

7  services to VIZIO's customers whose VIZIO televisions were repaired by HDRepair,

8  Defendants misled and deceived VIZIO's customers to believe that VIZIO approved

9  of, endorsed, or sponsored Defendants' activities and HDRepair's advertised services.

10  Such wrongful conduct constitutes false association or false endorsement under the

11  Lanham Act.

12  72.  VIZIO has not consented to Defendants' use of the Marks.

13  73.  Defendants' unauthorized use of the Marks was and is willful.

14  74.  Defendants' acts constitute false or misleading statements in connection

15  with products and/or services distributed in interstate commerce, a violation of section

16  43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

17  75.  Defendants' wrongful activities caused and continue to cause VIZIO to

18  suffer irreparable injury.

19  76.  VIZIO is informed and believes that unless said conduct is enjoined by

20  this Court, Defendants will continue to expand their activities and cause further

21  continued and irreparable injury to VIZIO.  This injury includes damage to VIZIO's

22  brand, reputation, and goodwill.  This injury cannot be remedied through damages,

23  and VIZIO has no adequate remedy at law.

24  77.  VIZIO is entitled to preliminary and permanent injunctions, pursuant to

25  15 U.S.C. § 1116, restraining and enjoining Defendants and their agents, servants,

26  employees, and all persons acting thereunder, in concert with, or on their behalf, from

27  using the Marks, digitally or otherwise, to market services or products without

28  VIZIO's consent.

COMPLAINT

78.    VIZIO is entitled to recover pursuant to 15 U.S.C. § 1117: (a) any profits realized by Defendants; (b) VIZIO's ascertainable damages; and (c) VIZIO's costs of suit. Defendants' willful conduct, without excuse or justification, renders this an exceptional case and entitles VIZIO to reasonable attorney's fees.

## **THIRD CLAIM FOR RELIEF**

Misappropriation of Trade Secrets – *California Civil Code* §§ 3426 *et seq.*

By VIZIO against All Defendants

79.    VIZIO realleges the allegations in the preceding paragraphs as if fully set forth herein.

80.    At all relevant times, VIZIO has conducted business in California and elsewhere using confidential and proprietary information and trade secrets, including VIZIO's customer list. VIZIO's customer list was a trade secret at the time of Defendants' misappropriation.

81.    VIZIO's customer list is not generally known to the public or entities in the consumer-electronics industry, nor is it generally known to entities in the industry of selling services for consumer electronics, such as cable, internet, or satellite subscriptions.

82.    VIZIO's customer list has independent economic value because it identifies consumers who purchased high-end electronics, and who are more likely to purchase related services, such as cable, internet, and satellite subscriptions.  The customer list also provides each customer's contact information and the model and serial number of their VIZIO television(s).

83.    VIZIO made reasonable efforts to maintain the secrecy of its customer list.

84.    Despite VIZIO's efforts, Defendants misappropriated VIZIO's customer list by calling VIZIO customers to market cable, internet, and satellite subscriptions, and by distributing VIZIO's customer list among themselves.

COMPLAINT

85.     VIZIO's customers complained about such unwanted marketing calls and complained about VIZIO on VIZIO's publically-available Twitter page.

86.     VIZIO suffered and continues to suffer harm.

87.     Defendants' use and disclosure of VIZIO's customer list was a substantial factor in causing VIZIO's harm.

88.     VIZIO has no adequate remedy at law for these present and imminent future injuries. VIZIO, therefore, is entitled to injunctive relief prohibiting Defendants from continuing their disclosure and/or use of VIZIO's customer list.

89.     VIZIO is also entitled to damages for the actual loss caused by Defendants' misappropriation, and/or for any unjust enrichment Defendants caused by such misappropriation.

90.     Defendants' misappropriation of VIZIO's trade secrets was willful and malicious. California Civil Code §§ 3426.3(c) and 3426.4, therefore, entitle VIZIO to an award of punitive damages, as well as reasonable attorney's fees.

## FOURTH CLAIM FOR RELIEF

Conversion

By Plaintiffs against All Defendants

91.     VIZIO realleges the allegations in the preceding paragraphs as if fully set forth herein.

92.     Plaintiffs own and have the right to possess various parts inventory. These parts were provided to HDRepair for the express purpose of performing repair and warranty services on VIZIO's televisions.  (Ex. 2, Section 1(d).)

93.     Defendants exercised dominion and control over the parts inventory by maintaining possession of the property and improperly refusing to return the property. Defendants intend to maintain possession of the parts inventory.

94.     Plaintiffs did not and do not consent to Defendants' conduct.

COMPLAINT

95.    As a direct and proximate cause of Defendants' conduct, Plaintiffs suffered and continue to suffer harm in an amount to be proven at trial, but believed to exceed $75,000.

96.    Defendants acted with malice, oppression, and fraud; thereby entitling Plaintiffs to an award of punitive damages.

### FIFTH CLAIM FOR RELIEF

Libel

By VIZIO against Defendant Louis Weltman

97.    VIZIO realleges the allegations in the preceding paragraphs as if fully set forth herein.

98.    On information and belief, Mr. Weltman made statements about VIZIO, sent through electronic mail, to technicians who were or are owed money by Syntechs. These statements blamed VIZIO for Syntechs' failure to pay its technicians.

99.    The technicians who were owed money by Syntechs reasonably understood that the statements were about VIZIO.

100.    The technicians reasonably understood the statements to mean that VIZIO was directly responsible for paying Syntechs, and that VIZIO was the direct and proximate cause for Syntechs' failure to pay the technicians.

101.    Because of the facts and circumstances known to the technicians, the statements tended to injure VIZIO by exposing VIZIO to hatred and contempt.

102.    Mr. Weltman knew the statements were false or had serious doubts about the truth of the statements.

103.    VIZIO suffered harm to its business, reputation, and goodwill.

104.    Mr. Weltman's statements were a substantial factor in causing VIZIO's harm.

105.    VIZIO suffered and continues to suffer damages in an amount to be proven at trial but in excess of $75,000.

COMPLAINT

106.   Mr. Weltman acted with malice, oppression, and fraud; thereby entitling VIZIO to an award of punitive damages.

## SIXTH CLAIM FOR RELIEF

Breach of Contract

By Plaintiffs against HDRepair

107.   Plaintiffs reallege the allegations in the preceding paragraphs as if fully set forth herein.

108.   AmTRAN and HDRepair entered into a written contract, the *Maintenance Agreement*.

109.   VIZIO was a third-party beneficiary of the *Maintenance Agreement.*

110.   AmTRAN performed all or substantially all of the material terms that the *Maintenance Agreement* required.

111.   HDRepair breached the *Maintenance Agreement* by using and disclosing VIZIO's customer list as alleged above. HDRepair also breached the *Maintenance Agreement* by using the Marks as alleged above.

112.   Plaintiffs suffered and continue to suffer harm by HDRepair's breach of the *Maintenance Agreement*.

113.   Plaintiffs seek damages in an amount to be proven at trial but in excess of $75,000.

114.   AmTRAN is entitled to attorney's fees and costs incurred in connection with this action.  (Ex. 2, Section 15.)

## SEVENTH CLAIM FOR RELIEF

Unfair Competition

By Plaintiffs against All Defendants

115.   Plaintiffs reallege the allegations in the preceding paragraphs as if fully set forth herein.

COMPLAINT

116.   Defendants used VIZIO's customer list and Marks, as well as Plaintiffs' parts inventory, in a manner that is not authorized by Plaintiffs, at no cost to Defendants, and at great costs to Plaintiffs.

117.   VIZIO invested substantial time, skill, and money marketing to its customers as a company that sells high-quality consumer electronics with excellent customer service.  Defendants' improper conduct has reduced VIZIO's goodwill, reputation, and undermined the confidence in VIZIO's ability to service its customers.

118.   AmTRAN invested substantial time, skill, and money protecting the confidentiality of VIZIO's customer list.  Defendants' acts have undermined the confidence in AmTRAN's ability to provide its customers, including VIZIO, with superior service.

119.   Plaintiffs invested time and money into the parts inventory.

120.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and continue to suffer damages in an amount to be proven at trial, but believed to be in excess of $75,000.

## EIGHTH CLAIM FOR RELIEF

Unfair Competition in Violation of *California Business and Professions Code* §§ 17200 *et. seq.*

By Plaintiffs against All Defendants

121.   Plaintiffs reallege the allegations in the preceding paragraphs as if fully set forth herein.

122.   Defendants committed business acts and practices that are unlawful and unfair in violation of California Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200 *et seq.*

123.   Defendants unlawfully misappropriated VIZIO's customer list, improperly used and continue to use VIZIO Marks in violation of the Lanham Act,

19

COMPLAINT

and converted Plaintiffs' parts inventory. Defendants' acts and practices violate California laws including but not limited to California Civil Code §§ 3426 *et seq.*

124.   Defendants' business acts and practices are unfair and violate the UCL. Defendants' acts are illegal, impair fair and honest competition, and otherwise significantly harm competition in the market for Plaintiffs' products and services.

125.   Unless enjoined by this Court, Defendants' may continue to use VIZIO's Marks, use and/or disclose VIZIO's customer list, and use Plaintiff's parts inventory.

126.   By reason of the alleged acts and conduct of Defendants, Plaintiffs have suffered and continue to suffer harm, the amount of which will be difficult to ascertain, so Plaintiffs will be without an adequate remedy at law.

127.   Plaintiffs are entitled to an injunction restraining Defendants, and all persons acting in concert with them, from using, copying, publishing, disclosing, transferring, and/or selling VIZIO's customer list, Marks, and Plaintiffs' parts inventory, and from obtaining any commercial advantage or unjust enrichment from Defendants' conduct.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter preliminary and final judgments, orders, and decrees in Plaintiffs' favor and against Defendants, and each of them, as follows:

1.   For a preliminary and permanent injunction restraining Defendants from soliciting and marketing services to VIZIO's customers without VIZIO's or its customers' consent;

2.   For a preliminary and permanent injunction restraining Defendants from using VIZIO's Marks;

3.   For an order requiring Defendants to return Plaintiffs' parts inventory;

4.   For damages compensating Plaintiffs as permitted by law and according to proof, including Defendants' profits;

5.   For restitution in an amount according to proof;

COMPLAINT

6.  A finding that Defendants' infringing acts constitutes an exceptional case entitling VIZIO to attorney's fees;

7.  For exemplary damages for Defendants' willful and malicious misappropriation of VIZIO's trade secrets;

8.  For an award of VIZIO's attorneys' fees for Defendants' willful and malicious misappropriation of VIZIO's trade secrets;

9.  A finding that HDRepair breached the *Maintenance Agreement*, entitling AmTRAN to costs and attorney's fees;

10. For an award of punitive damages;

11. For costs of the suit incurred therein; and

12. For such other relief as the Court deems proper.

Dated:  November 16, 2015          LEE TRAN & LIANG LLP

                                   By: /s/ James M. Lee
                                   James M. Lee
                                   Danielle R. Claxton
                                   Attorneys for VIZIO, Inc. and
                                   AmTRAN Technology Co., Ltd.


### DEMAND FOR JURY TRIAL

Plaintiffs VIZIO and AmTRAN hereby demand a jury trial.

Dated:  November 16, 2015          LEE TRAN & LIANG LLP

                                   By: /s/ James M. Lee
                                   James M. Lee
                                   Danielle R. Claxton
                                   Attorneys for VIZIO, Inc. and
                                   AmTRAN Technology Co., Ltd.

COMPLAINT

# EXHIBIT  1

**Page 22 of 108**



Revision: April 2011

## VIZIO INC. STANDARD SUPPLY AGREEMENT

THIS VIZIO INC. STANDARD SUPPLY AGREEMENT ("**Agreement**") is effective as of __January 1, 2012__ ("**Effective Date**") by and between VIZIO, Inc. ("**VIZIO**"), a corporation organized under the laws of the State of California, having an office at 39 Tesla, Irvine, CA 92618, and AmTRAN Technology Co., Ltd a corporation organized under the laws of Taiwan, R.O.C., having its principal offices at 17F No.268 Lien Chen Road, Chung-Ho District, New Taipei City, including its subsidiary AmTRAN Logistics, Inc., a corporation organized under the laws of the State of California ("**Supplier**"). VIZIO and Supplier are sometimes individually referred to herein as a "**Party**" and collectively as "**Parties.**"

### RECITALS

WHEREAS, VIZIO sells plasma and LCD HDTV television sets, other consumer electronics products and related accessories under the VIZIO brand name and trademarks;

WHEREAS, VIZIO desires to purchase from Supplier, and Supplier desires to sell to VIZIO, such products and accessories specified herein, upon the terms and conditions set forth in this Agreement ("**Purpose**"); and

WHEREAS, the Parties desire to amend and restate prior supplier agreement and related amendments ("**Initial Agreements**") to (i) accurately reflect the intent of the Parties, and (ii) acknowledge and reflect terms that were agreed upon and effectuated subsequent to the execution of the Initial Agreements, including without limitation, certain obligations of the Parties;

NOW THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby amend, restate, cancel, and supersede the Initial Agreements in their entirety, and agree and covenant, as follows:

### SECTION 1. DEFINITIONS

The following capitalized terms shall have the meanings given to them below:

VIZIO Confidential

Initials: Supplier _____ VIZIO _____

**Page 23 of 108**

Revision: April 2011

1.3.    **"Business Day"** (whether initial letters are capitalized or not) means a day other than a Saturday, Sunday or a day on which commercial banks in California, or in the location of the Person obligated to perform an act or obligation under this Agreement is to occur, is closed or required to close under the Law.

1.4.    **"Claim"** means claims, demands, suits, criminal or civil actions or similar proceedings that might be alleged by a third-party (including enforcement proceedings by any Governmental Authority), and all liabilities, damages, fines, penalties, costs or expenses (including reasonable attorneys' fees and expenses and other reasonable costs for defense, settlement and appeal) that any Party might incur, become responsible for, or pay out for any reason, related to this Agreement.

1.7.    **"Delivery Note"** means the instructions that VIZIO may, from time to time, provide to the Warehouseman authorizing Delivery of the Product on the Delivery Date and shall specify for the Products that are the subject of the applicable Delivery Note: (i) the Product identification number and a short description of such units (including model or size), (ii) the quantity of each model to be Delivered, and (iii) the Delivery Date. Supplier shall ensure that Warehouseman delivers Products in accordance with the Delivery Note provided by VIZIO.

1.8.    **"Force Majeure"** means an act of God, war, revolution, terrorism, riot, fire, explosion, flood, hurricane, tornado, cyclone, earthquake, natural disaster, blockade or embargo, labor strikes, lockout, or other similar condition or occurrence.

1.9.    **"Forecast"** means VIZIO's good faith, non-binding estimates of its demands, typically for periods

VIZIO Confidential

Initials: Supplier ___ /VIZIO ___

**Page 24 of 108**

Revision: April 2011

1.10.   "**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity, officer or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign entity or government.

1.11.   "**Hub**" means one or more shipping hubs managed or operated, directly or indirectly, by Supplier.

1.13.   "**Intellectual Property Rights**" means any present or future intellectual property rights worldwide arising under statutory law, common law or by contract, and whether or not perfected, including without limitation, all: patents, utility models, design patents, designs (whether or not capable of registration), industrial property rights, trademark, trade dress and trade name rights, trade secrets or other confidential information, copyrights, mask work rights, and any other proprietary rights relating to intellectual property and Technology (hereinafter defined); and including any and all applications, registrations, combination, divisional, continuation, renewal, reissue and extension of the foregoing, hereinafter filed, used or acquired relating thereto.

1.14.   "**Law**" means any multinational, national, federal, state, provincial, local, foreign or domestic laws, rules, regulations, ordinances, codes and standards related in any way to the performance of this Agreement.

1.15.   "**Losses**" means any claim, charge, loss, cost, damage, expense, obligation, fee, reasonable attorneys' fees, court costs, penalty or liability, including any fees and costs associated with any appeal, arbitration, injunction, or settlement.

1.16.   "**Market Differentiator**" means any feature, character, aspect or indicator of any Product designed, developed, fabricated, manufactured, supplied to or on behalf of VIZIO ("**VIZIO Product**") that differentiate such VIZIO Product in from same or similar products in the market place, including without limitation industrial design, user interface, applications, display modules, software operation and programming techniques; any feature, character, aspect or indicator relating to the look, use and/or feel of any VIZIO Product shall specifically be a Market Differentiator hereunder.  For avoidance of doubt, the mechanical engineering and electrical engineering that could exist independent from the industrial design, user interface, or the touch and/or feel of Product, are not Market Differentiator.

1.17.   "**Open Source Software**" shall mean any software that contains, or is derived in any manner (in whole or in part) from any software that is distributed as free software, open source software, or similar licensing or distribution models, including without limitation any software distributed under a license that requires, as a condition of use, modification and/or distribution of such software, that other software incorporated into, derived from or distributed with such software be: (i) disclosed or distributed in source code form; (ii) licensed for the purpose of making derivative works; or (iii) redistributable at no charge.

VIZIO Confidential

Initials: Supplier___ :VIZIO ___

Revision: April 2011

1.18.    "**Permits**" means all governmental certifications, licenses, permits and authorizations required for the manufacture, assembly, importation, marketing, offering for sale, sale, and use of the Products.

1.19.    "**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

1.20.    "**Product Warranty**" means the warranty for a given Product as set forth in Section 7.1.

1.21.    "**Products**" means televisions, displays, other consumer electronics products and/or related products as may be specified in the Forecast or Vendor Consignment P.O. by VIZIO from time to time.

1.23.    "**Return for Credit Process**" ("**RFC Process**") means the process flow set out in **Exhibit A**, as modified by VIZIO from time to time upon sixty (60) days notice.

1.24.    "**Return for Repair Process**" ("**RFR Process**") means the process flow set out in **Exhibit B**, as modified by VIZIO from time to time upon sixty (60) days notice.

1.25.    "**Return for Replacement Process**" ("**RFP Process**") means the process flow set out in **Exhibit C**, as modified by VIZIO from time to time upon sixty (60) days notice.

1.27.    "**Specifications**" means all physical, functional and technical elements, attributes, and requirements for the design, manufacture, testing, performance, operation, installation, removal, maintenance, or repair of a Product, regardless of the media (or absence) on which they are contained, including any specification list, blueprints, drawings and schematic diagrams as may be agreed, supplemented or modified in writing signed by both Parties from time to time.

1.28.    "**Technology**" means any proprietary technology, inventions, discoveries, designs, data, concepts, ideas, processes, methods, techniques, know-how and similar information, including without limitation technical specifications, schematics, engineering drawings; and any derivations, improvements and modifications of the foregoing.

1.29.    "**VIZIO Marks**" means the VIZIO trademark in both its word and stylized forms, and all tradenames, trademarks, service marks, logos and slogans used from time to time by VIZIO in connection with its goods and services, whether or not registered and throughout the world and all goodwill related thereto.

Initials: Supplier _Ti_ VIZIO _W_

VIZIO Confidential

Revision: April 201.

## SECTION 2. MANUFACTURE, ORDERING AND DESIGN OF PRODUCTS

2.1.

(a)     Non-binding.  Supplier acknowledges and agrees that any quantities listed in any Forecast or other correspondence between VIZIO and Supplier are estimates made by VIZIO solely as an accommodation to Supplier and solely for informational purposes to help facilitate Supplier's capacity planning.  All Forecasts are non-binding and do not constitute in any way a commitment by VIZIO to purchase any such quantities or by Supplier to supply any such quantities. Supplier shall use good faith efforts to meet VIZIO's desired quantities guidance contained in the Forecast and provide reasonable advanced notice if there would be material deviation from the Forecast.  VIZIO to use good faith efforts to work with Supplier to address over Forecast.

(b)     Advertised Promotions.  Supplier shall have the right to participate in the process of making any Advertised Promotions plans.  When negotiating an Advretised Promotion, VIZIO shall designate certain quantities on Forecasts as "Advertised Promotions" and in good faith provide relevant VIZIO customer's requriement(s) such as pricing, quanity, required In-Hub Date, Delivery Date and potential adverse consequences, additional costs and/or any other Losses that may be assessed to Supplier for any late and/or non-Delivery of Advertised Promotions.  Supplier shall have the chance to decide whether to accept such proposed Advertised Promotions withir

            If Supplier agrees to accept such Advertised Promotions Forecast, then Supplier agrees that VIZIO and its customers may specifically rely upon Supplier to meet the quantities, models, and Shipment Dates and, its reliance thereon, among other things, spend money on advertising, print ads, in-store ads, media and other types of marketing or advertising activities.

VIZIO Confidential

Initials: Supplier _____ VIZIO

Revision April 2011

2.2.   Tooling and/or Equipment.

(a)   Supplier shall, at its expense, purchase, acquire, license or otherwise manufacture all necessary tooling and/or equipment for the design, development, fabrication, manufacture, and/or testing specific or relating to any Product ("**Tooling and Equipment**"), unless otherwise agreed to in writing by the parties.  Supplier shall own all right, title and interest in and to such Tooling and Equipment hereunder, and shall only make or otherwise use such Tooling and Equipment only for the Products and/or Purpose contemplated in this Agreement.  Supplier shall not make, use, build, disassemble, reverse-engineer, rent, lease, sell or otherwise transfer any Tooling and Equipment for the manufacture of products similar to the Products, or for any other third party or purpose other than the Purpose contemplated in this Agreement.

(b)   Except as otherwise agreed in writing by the parties or as provided herein, Tooling and Equipment provided by a party or purchased by or on behalf of a party, shall remain the property of the provisioning or purchasing party, as applicable.

(c)   **Exhibit N** hereto, or any similar writing, shall control with respect to any Tooling and Equipment, including without limitation, costs, quantities, rates of Product purchases before the Tooling and Equipment is considered fully amortized ("**Full Amortization**") and special instructions or conditions, if any, relating to the same.

(d)   VIZIO shall have the right (but not the obligation) to take title to any Product Tooling and Equipment made and/or used by Supplier hereunder upon or after the occurrence of any of the following:

(i)   Full Amortization of such Tooling and Equipment in accordance with **Exhibit N** or any similar writing between the parties, and VIZIO will have such right to take title with no further costs, fees or amounts;

(ii)   Expiration or termination of this Agreement, and VIZIO will have such right to take title for an amount not to exceed the unamortized amount, if any, for such Tooling and Equipment in accordance with the schedule set forth in **Exhibit N** or any similar writing between the parties;

(iii)   Upon material breach by Supplier of any provision in this Agreement which material breach remains uncured for thirty (30) days following written notice, and VIZIO will have such right to take title with no further costs, fees or amounts; or

(iv)   As otherwise mutually agreed upon by the parties in writing.

Notwithstanding the foregoing, from the time such right to take title accrues to VIZIO under this Section and unless and until VIZIO takes delivery of any such Tooling and Equipment, Supplier shall be obligated at its own expense to:

VIZIO Confidential

Initials: Supplier _____ VIZIO _____

Revision: April 20 | |

2.3.   Manufacture.  Supplier shall manufacture and ship Products and issue corresponding ASNs in accordance with the Forecast, Specifications and this Agreement. Supplier shall maintain the labor, materials and facilities necessary to manufacture the Products in accordance with all Forecasts.  Supplier may subcontract or delegate to other Persons any of its obligations hereunder with VIZIO's prior written consent and such consent shall not be unreasonable withheld.

2.4.   Purchases.  VIZIO may, but shall not be obligated to, from time to time, initiate the purchase of Products that have been recorded as

Parties may enter into separate Individual Product Agreement(s) which may specify certain MOQ's.

2.5.   Production and Shipping Reports.  In addition to the ASN, Supplier shall provide VIZIO with (a) a weekly production report detailing the quantity, type and stage of Products in Supplier's production process, the quantity and type of Products produced, shipped, and received into the Hub, and such other information as the Parties agree should be included in such report, and (b) a weekly shipping report detailing for the Business Day specifying: the destination, quantity, intended delivery date, and such other information as the Parties agree should be included in such report (collectively "**P+S Reports**").  The P+S Report shall match the time period covered by the Forecast.  The immediate preceding three (3) months of the P+S Reports prior to applicable individual In-Hub date(s) shall be firm and binding on Supplier and may not be later adjusted after initial submission without VIZIO's consent.

2.7.   Changes to Product Designs.  VIZIO may upon reasonable prior notice request changes in (a) Specifications, (b) the method of shipment and packing, or (c) the time and destination address.  Supplier shall notify VIZIO of any requested changes that would affect: (a) the time for performance of Supplier's obligation, (b) the cost of manufacturing, or (c) any other costs, taxes, charges, or exports.  If VIZIO elects to proceed, then VIZIO and Supplier shall discuss and attempt to agree upon a commensurate increase or decrease in the purchase price or a revision of the shipment schedule, or both, prior to implementing any such change with prior writing to VIZIO.  Supplier may make changes in the Products and/or Specifications at any time to improve reliability, quality or safety, to comply with the Law, or to adapt to changes in materials sourcing; provided, however, that Supplier will not alter or change exterior appearance or functional characteristics or reduce performance without obtaining prior approval from

Page 7 of 59

Initials: Supplier ___ /VIZIO ___

Revision: April 2011

VIZIO.

2.8.   Packaging.  Supplier shall package and label all Products in accordance with the Specifications and any other instructions reasonably issued by VIZIO.  Where packaging is not specified in the Specifications or other instructions, Supplier shall package Products in a manner which (i) follows good commercial practice, (ii) is acceptable to common carriers for shipment, and (iii) is adequate to ensure safe arrival.  Supplier shall mark the outside of each shipment container with all numbers and necessary handling and lifting information.  Supplier shall ensure that all VIZIO Marks, any other marks, and other required or necessary regulatory information are correctly printed on the exterior of each shipment container and pallet.

## SECTION 3.   PRICING AND PRICES

3.1.   Pricing.  Prices for each Product shall be

to time and set forth in a writing, schedule or other document, such as by Individual Product Agreement, (individually or collectively, "Purchase Information Record").

3.3.   Competitive Pricing of Products by Supplier.  Supplier shall maintain competitive pricing for VIZIO, using its best efforts to aid VIZIO for cost reduction of the Products, procuring materials and services for the Products, and optimizing the manufacture of the Products.

VIZIO Confidential

Initials: Supplier ___ VIZIO _NS_

Revision: April 2011

Supplier agrees that any cost savings from price rebate, discount, or other discount mechanism shall be fully reflected in the pricing within the business model.

3.4.   **Pricing to VIZIO Customers; Changes.**  From time to time, it may be in the best interests of VIZIO and Supplier to reach an agreement whereby VIZIO would offer Price Concessions to its customers for Products that VIZIO has already sold to these customers;

The total value of any mutually agreed upon Price Concessions offered and extended by VIZIO to its customers shall then be deducted from Supplier by VIZIO.  Supplier shall negotiate in good faith to accommodate such pricing reduction requests by VIZIO or its customers.  If after good faith negotiation, VIZIO and Supplier are unable to agree on any price changes (either before or after delivery),

3.5.   **Price Protection and Rebate.**  Where VIZIO is obligated to reimburse its customers due to price protection, customer charge-backs, sell-through credits, special promotions, rebate programs, or other similar processes ("**Price Protection**"), Supplier agrees to be responsible for all costs associated with such Price Protection unless otherwise agreed to by the Parties in advance in writing.

**SECTION 4.**                          **TITLE AND RISK OF LOSS**

4.1.   **Advance Shipping Notices**                    .  Supplier shall issue ASNs and ship the Products to the designated Hub on or before                specified on any applicable Forecasts and P&S Reports and promptly notify VIZIO in writing if it anticipates any problems meeting the                , quantities, or ATP Inventory levels in any applicable Forecast.  VIZIO may rely on the information contained in an ASN, and may proceed to accept orders from, or extend commitments to its customers.  In the event that VIZIO relies on such ASN and allocated shipment to its customers, Supplier shall promptly reimburse VIZIO for any actual Losses suffered by VIZIO as the result of such reliance.  Once issued in accordance with the P+S Reports, ASNs may not be modfied without VIZIO prior reasonable wirtten consent.

VIZIO Confidential

Initials: Supplier ___ VIZIO ___

Revision April 2014

4.3.   ATP Inventory Management at Hub.  Supplier shall be responsible for maintaining the required ATP Inventory levels of Products              to reflect the Forecast and the P&S Reports.  ATP Inventory levels shall not include those units which are unsatisfactory to VIZIO due to quality issues and/or which fail to meet the Specifications.

4.4.   Late Shipment Charges.  If Supplier becomes aware that Products may arrive late or if Product arrives at the applicable Hub after the              specified or is not A              as scheduled in the most current agreed upon and committed              period and as reflected by the applicable ASN (other than cause(s) solely attributed and solely caused by VIZIO), Supplier shall be responsible to VIZIO for all actual Losses, according to proof, including, but not limited to late shipment charges and expedited freight charges.              Products received on time but are not able to be shipped to VIZIO's customer(s) due to quality and/or other issues shall be considered Late Shipment.

4.5.   Liens Prohibited.  All Products sold to VIZIO hereunder shall be free from any Claims, liens or encumbrances.


## SECTION 5.   INVOICING & PAYMENT

5.1.   Invoices.  Following issuance of a Delivery Confirmation by Warehouseman, Supplier will issue an invoice, in accordance with **Schedule A**.

5.2.   Payment Terms.

In the event that VIZIO customer(s) request additional payment terms, Parties agree to negotiate in good faith to accommodate such request.  All Supplier invoices to VIZIO shall identify


5.3.   Offset.  With respect to any payment, reimbursement or other amount owed by Supplier to VIZIO under this Agreement or any other agreement, VIZIO may offset any such amount owed against any amount then-owing or to be owed by VIZIO to Supplier under this Agreement or any other agreement.

5.4.   Payment Instructions.  All payments shall be made by wire transfer to the following account, or by other method as Supplier may instruct in writing from time to time:

Account Name:
Bank Name:
Bank Address:
Account Number:
Bank ABA Number:

VIZIO Confidential

Initials: Supplier____VIZIO____

Revision: April 2011

Swift Code:

## SECTION 6.  QUALITY ASSURANCE, REGULATORY COMPLIANCE AND OPEN SOURCE SOFTWARE

6.1.  Quality.  Supplier shall follow the Quality Assurance Procedures,

6.2.  Compliance with the Law.  Supplier shall comply with all applicable Laws and use its best efforts to obtain and maintain all Permits and VIZIO shall reasonably cooperate with the Supplier in such efforts.  If a Governmental Authority requests or orders, or if VIZIO undertakes, any corrective action with respect to the Products supplied hereunder, then Supplier shall reimburse VIZIO for the reasonable costs to the extent the cause or basis of such request, order, or action is attributable to any breach by Supplier.

6.3.  Regulatory and Standards Compliance.  Supplier warrants that the Specifications of all Product manufactured by Supplier for VIZIO are adequate to obtain any such approvals or ratings which VIZIO may be required to obtain including, without limitation, approval of the United States Federal Communications Commission, Underwriters Laboratories, Inc., Canadian Standards Association, compliance with standards adopted by the United States Consumer Product Safety Commission, the National Center for Devices and Radiological Health, and obtaining any other approvals or ratings required now or in the future by Laws.  Supplier shall attach all markings on the Product required by the Laws.  VIZIO agrees to give Supplier all appropriate assistance to secure such approvals, ratings, and compliance.  Supplier shall conduct such tests and maintain such records as are required by the above mentioned authorities. Supplier hereby warrants and certifies that the Product will be tested to meet the requirements of all applicable Laws, including Federal Communications Commission Regulations, 16 CFR, Part 15, and that they will be performed at a test site approved by the Federal Communications Commission using measurement procedures consistent with industry and Federal Communications Commission's regulations.

6.4.  Records.  Supplier shall maintain complete and accurate books and records in the English language for the longer of the length of time required by this Agreement or by Law. Supplier shall, upon VIZIO's request, (a) permit VIZIO to inspect or audit the books and records related to this Agreement and make copies thereof and/or (b) provide VIZIO with remote access to electronic copies or physical copies records relevant to the Products specified by VIZIO

6.5.  Inspection.  VIZIO may, upon reasonable notice to Supplier and during regular business hours, inspect the facilities used by Supplier or any contractor of Supplier to assure compliance with this Agreement.

6.6.  Open Source Software.

(a)  Description.  Supplier shall provide to VIZIO (i) a list of all Open Source Software incorporated into or combined with the Product, (ii) a description of how the Open

Page 11 of 59

VIZIO Confidential

Initials: Supplier ___ VIZIO ___

Revision: April 2011

Source Software is incorporated with or into, or interacts with the Product or any technology that may be incorporated with the Product, and (iii) a copy of the license governing the use and distribution of the Open Source Software. All Open Source Software shall be identified by Supplier on Exhibit H and shall be amended by Supplier as necessary. VIZIO discourages the use of any

(b)     Warranty. Supplier represents and warrants that the Product does not contain any                            that would (i) create obligations for VIZIO or (ii) grant to any third party any rights or immunities in, to or under the Products, VIZIO Intellectual Property or VIZIO proprietary technology.

## SECTION 7.  WARRANTY

7.1.    Manufacturer's Warranty. Except for any written warranties or guaranties expressly provided herein, Supplier provides no other implied, oral, written or express warranties. Supplier warrants to VIZIO that:

(a)     All Products shall conform to the applicable Specifications and be free from defects in materials, workmanship, design, fit and finish except where such defects are due to the unique nature of the design or materials designated or required by VIZIO, and Supplier will take reasonable steps to provide VIZIO with advance written notice about any potential defect, which shall not apply to commoditized products (i.e. if VIZIO requires or designates a particular LCD module or panel); and

(b)     All services performed by Supplier for such Products will be performed in a workmanlike manner.

7.2.    Warranty Claim Procedure.

(a)                             shall cover defects in Products, end-user documentation and manuals, and packaging                           Shipment of Products by Supplier to VIZIO shall constitute a certification by Supplier that the Products comply with the Product Warranties. Parties shall negotiate and accrue certain allowances for repairs, NDF and RFC in the business model.

(b)     VIZIO shall provide, in a written notice, the nonconforming characteristics of any Products ("Warranty Claim"), and may, at any time

return to Supplier any Products which do not conform to the Product Warranty. The Warranty Claim shall require the Supplier, at its expense, to

Supplier shall repair Products to meet original factory Specifications at no charge. Except for those claims excluded in Section 7.7, within fourteen (14) days from the time any Products in breach of the Product Warranty are returned to Supplier (as shown on the proof of delivery), Supplier shall use

VIZIO Confidential

Initials: Supplier         VIZIO

Revision April 2011

all reasonable efforts to complete the repair or replacement and return such Products to the location designated by VIZIO in the Warranty Claim, bearing any and all expenses, including but not limited to

     (c)   If after
Supplier, the unit is not                         Supplier will
credit VIZIO the price paid by VIZIO, including any duties and other associated costs for that item.

     (d)   Products returned by VIZIO for              that are determined by Supplier not to be in breach of the Product Warranty after appropriate inspection or testing, will be referred to as "No Defect Found" returns ("NDF").

     7.3.   Cartons and Packaging for Return Shipping.  Supplier shall provide a reasonable number of cartons and packaging for returned Products, free of any charge, to customers or end-users that need a box for Product Warranty returns.  VIZIO is not responsible for Products damaged while in transit and if a unit is received damaged, VIZIO will notify Supplier upon receipt of the damaged Product for further instruction.

     7.4.   Dispute.  Supplier agrees to work with VIZIO in good faith to ensure that warranty and service obligations are met.  Parties shall attempt to resolve any dispute over a Warranty Claim; if they are not able to resolve the dispute           the dispute shall be escalated to appropriate executive officers of each Party for resolution.

     7.5.   Refunds and Credits.  If VIZIO has already furnished payment to its customer for a valid Warranty Claim, then

     7.6.   Customer Service.  VIZIO shall be the sole contact for customer service and warranty support to VIZIO's customers and end-users.

     7.7.   Exclusions.  Supplier shall have no Warranty obligations for cosmetic damage, missing accessories, abuse or misuse, improper storage, or negligence (to the extent caused by any person or entity other than Supplier), improper installation, or any Warranty Claim made after the expiration of the            (collectively, "**Out-of-Warranty**").

     7.8.   Out-of-Warranty Service.  Supplier shall provide Out-of-Warranty service for Products to VIZIO and end-users in accordance with policies and prices mutually agreed by the Parties from time to time, but not without authorization from VIZIO or the end-user.

VIZIO Confidential

Initials: Supplier /TW VIZIO /US

Revision: April 2011

7.10.   Recall.  In the event that (a) there is a Governmental Authority-directed recall or statutory seizure, (b) the quality of any Product is found by any Governmental Authority to be against public safety, or (c) credible evidence supports the reasonable belief by VIZIO that the quality of any Product is against public safety, VIZIO shall give Supplier prompt notice of such event and provide a sample Product that will enable Supplier to carry out further testing.

7.11.   Epidemic Failures.  The rights and remedies set forth in this Section 7.11 are in addition to and in no way limit the other rights and remedies set forth in this Section.

(a)   "**Epidemic Failure**" means Product failures or breaches of Warranty at or above a particular rate due to defects in materials, workmanship, manufacturing process or design deficiencies, including but not limited to use of components with

(b)   VIZIO shall promptly substantiate its claim of an Epidemic Failure in writing with data, and Supplier shall verify such data to determine whether such failures are a result of a breach of the Product Warranty from the same or substantially same root causes ("**Verified Epidemic Failure**").

(c)   VIZIO and Supplier shall implement a plan to resolve a Verified Epidemic Failure in all existing units and all new units being manufactured.

(d)   If a Verified Epidemic Failure should occur, then Supplier shall:

(i)   Use its best efforts to resolve such Epidemic Failures

(ii)   At VIZIO's election, provide one or more of the following:

(iii)   Participate in technical meetings with VIZIO to identify the issues, define the investigation to determine the causes, report the results, and initiate containment and corrective actions;

Page 14 of 59

Initials: Supplier /s/ VIZIO /s/

VIZIO Confidential

Revision: April 2011

(iv)    Upon mutual agreement of the Parties, determine an appropriate remedy which may include, but not be limited to:

(v)    Pay all expenses of forwarding and return fright, for Products subject to the Epidemic Failure and requiring factory servicing, arrange the return of such Products;

(vi)    Ensure that all similar Products supplied have been modified to remove the cause of such Epidemic Failure;

(vii)    At VIZIO's request, and upon mutual agreement of the Parties, set up stock to help facilitate the return, repair or replacement of Products subject to the same root cause of the Epidemic Failure; and

(viii)    Where actions (i) - (vii) fail to rectify the problems, or Products are returned                              Supplier will undertake to replace, at its sole expense, all of the Products subject to the Epidemic Failure, with Products that conform to the Product Warranty.

7.12.    Replacement Parts.  For each Product purchased by VIZIO, Supplier shall make available replacement parts to meet VIZIO's needs for a

Supplier will provide a reasonable number of parts kits (remote, cables, power cords, etc.) free of any charge, to customers or end-users that need such parts for Product Warranty returns.

VIZIO's initial spare parts requirements will be delivered at the time Supplier makes the first shipment of Product.

7.13.    Supplier Reports.  Supplier shall provide VIZIO with a weekly return report broken out per model number and per incident between NDF and non-NDF and root cause failure.

### SECTION 7A.                              PROCESS

7A.1.   Products may be returned to Supplier by VIZIO in accordance with its customer's ; such returned Products shall be the responsibility of Supplier.  The                      is not applicable to Products that are subject to Section 7.8

7A.2.    A detailed                      is set forth on **Exhibit A** attached hereto.

VIZIO Confidential

Initials: Supplier ___ VIZIO ___

Revision: April 2011

### SECTION 7B.                          PROCESS

7B.1.  Products may be returned from VIZIO under its customer's
       which shall not include Products subject to Section 7.9.

7B.2  A detailed                is set forth in **Exhibit B** attached hereto.

### SECTION 7C.                          PROCESS

7C.1.  Products may be returned from VIZIO under its
       , which shall not include Products subject to Section 7.7.

7C.2  A                 process is set forth in **Exhibit C** attached hereto.

### SECTION 8.  DOCUMENTATION

8.1.    Printed Materials to Accompany Products.

(a)    Supplier shall prepare and print in English (and any other languages specified by VIZIO) all Product documentation (including but not limited to end-user manuals). VIZIO shall provide artwork for the Product documentation, and Supplier shall provide VIZIO with proofs of all printed materials for review and approval, with sufficient time in advance of production of Products to permit compliance with all scheduled shipments and deliveries. Upon VIZIO's review and approval, Supplier shall pack one full set of Product documentation per Product, unless otherwise specified by VIZIO.

(b)    Supplier shall, at its cost, supply and ship to VIZIO

VIZIO, Inc.
Product Management Group
39 Tesla
Irvine, CA  92618

(c)    Supplier assumes responsibility for the accuracy and sufficiency of such Product documentation, except for any materials and content included at the direction of VIZIO. If VIZIO seeks to include any materials or content in the Product documentation, then it shall provide such, at its expense,                        for inclusion with the Product.  VIZIO will furnish to Supplier

8.2.    Service Manuals.  Supplier shall prepare and deliver to VIZIO a service manual in English, with a list of parts suitable for each model of Products (or family of models using a common chassis).

VIZIO Confidential                                         Initials: Supplier ___ VIZIO ___

Revision: April 2011

## SECTION 9.  PROPRIETARY RIGHTS

9.1.   Licensing Rights.

(a)   Supplier to VIZIO.  Supplier hereby grants to VIZIO a worldwide, non-exclusive, fully paid, royalty-free license for all Supplier's Intellectual Property Rights specific or relating to the Products or for the Purpose or the performance of this Agreement.

(b)   VIZIO to Supplier.  VIZIO may grant to Supplier authorization in writing for Supplier's use VIZIO Marks, registered or unregistered, in connection with Products or for the Purpose or Supplier's performance of this Agreement, any such authorization expressly subject to VIZIO's trademark usage guidelines.  Supplier shall not assign, transfer or sublicense any licensing authorization granted under this Section to third parties by Supplier without prior written approval from VIZIO.

(c)   Supplier shall affix to each Product and the packaging thereof, the VIZIO Marks designated by VIZIO from time to time.  Supplier shall promptly notify VIZIO of any infringement of the VIZIO Marks that comes to Supplier's attention.

9.2.   Intellectual Property.

(a)   Pre-Existing Rights.  Except as otherwise set forth herein, neither this Agreement nor each party's performance hereunder, will give such party any ownership interest in or rights to the Intellectual Property Rights of the other party.  All Intellectual Property Rights that are owned or controlled by a party at the commencement of this Agreement will remain under the ownership or control of such party throughout the term of this Agreement and thereafter.

(b)   New Intellectual Property Rights.

As used herein, "New Intellectual Property Rights" will collectively mean any Intellectual Property Rights conceived, developed, enhanced, derived or otherwise arising from this Agreement during the term and/or performance of this Agreement.  VIZIO will retain all ownership to New Intellectual Property Rights that are Market Differentiator specific to any Product supplied hereunder regardless whether or not such New Intellectual Property Rights are result of or arise from joint collaboration, whether or not with any direction or input from VIZIO, and whether or not payments for New Intellectual Property Rights conceived, developed, enhanced, derived or otherwise arising hereunder are paid directly by VIZIO or on VIZIO's behalf except for the items contained in subsection (c) below.

(c)   Supplier shall retain all ownership to New Intellectual Property Rights independently developed in the following areas:

VIZIO Confidential

Initial: Supplier _____ /VIZIO _____

Revision: April 2011

(d)     Supplier Intellectual Property Rights shall not include the following:

1.  Information and direction specifically provided by VIZIO on picture quality and/or audio quality – settings, methods, measurements, etc.
2.  Any and all source code provided by VIZIO or VIZIO partners to the extent such third party owns or has sufficient rights to provide such Intellectual Property
3.  All work provided or completed by VIZIO partners including chipset providers and/or third party software engineering firms to the extent such VIZIO partner owns or has sufficient rights to provide such Intellectual Property IP
4.  All VIZIO Intellectual Property Rights and/or other third party Intellectual Property Rights brought from VIZIO to Supplier for implementation in a Product.

(e)     For avoidance of doubt, VIZIO shall own any and all rights to Market Differentiator, VIZIO Marks, artwork, box, user manual, quick start guide ("QSG"), on screen guide, industrial design, graphics design, printed materials and user interface and the following:

1.  VIZIO Logos and Marks, artwork, box, user manual, quick start guide, graphics design, printed materials etc.
2.  User Interface (flow, organization, graphical elements, animation, and content) and on screen guide
3.  Industrial Designs (both specific designs and the overall design language)
4.  Implementation of features at the direction of VIZIO
5.  Information and direction specifically provided by VIZIO on picture quality and/or audio quality – settings, methods, measurements, etc.
6.  Any and all source code provided by VIZIO or by other technology partners (in such case the IP may belong to such third party)
7.  All work provided or completed by VIZIO partners including chipset providers and/or third party software engineering firms (in such case the IP may belong to such third party)
8.  All VIZIO patents/IP and/or other third party IP brought to AmTRAN for implementation in a Product

(f)     Joint IP

To the extent that any Intellectual Property Rights other than the foregoing subsections (a) - (e) that are jointly invented and/or developed by the Parties and if the contributions of such Parties are undividable and related to this Agreement ("Joint IP"), such Joint IP rights shall be jointly owned by the Parties, and each joint owner shall have an equal, undivided interest in such Joint IP in all countries, unless otherwise mutually agreed upon by the Parties. Each Party shall have the right to make, have made, or use any Joint IP without the consent of and without accounting to the other owner, but no Party shall have the right to lease, sell or otherwise dispose

VIZIO Confidential

Initial: Supplier ___ VIZIO ___

Revision April 2011

of any Joint IP and to grant any licenses under such Joint IP without the prior written consent of and without accounting to the other owner, which consent shall be given so long as the owner granting such license fulfills its obligation, if any, to pay its proportionate share of the costs related to such Joint IP. Either Party shall have the right to bring an action for infringement of a Joint IP at its own expense only with the consent of the other owner. This consent may only be withheld if such action would be prejudicial to the other owner's commercial interests as demonstrated to the reasonable satisfaction of the joint owner interested in bringing such infringement action. Technical representatives of both Parties will use commercially reasonable efforts to timely notify the other party of the inception of such Joint IP, contemporaneously document and sign notebooks, meeting minutes or other similar documents to assist in documenting joint development. A written invention disclosure document shall be prepared by the technical representatives of both Parties, which shall be submitted to each Party's acting officer responsible for legal/patent affairs. Within ninety (90) days after the submission of a written invention disclosure, the Parties shall negotiate and agree to procedures for prosecution of the Joint IP developed hereunder. If, however, any one Party is not interested in filing an application for the Joint IP, the other Party may file such application at its own expense and shall be the sole owner of the Joint IP. The non-filing Party shall then assign its rights, title and interest worldwide in such Joint IP to the filing Party.

(g)    IP Inclusion Procedure.  In the event that AmTRAN elects to include any of its IP or new feature(s) in the design and/or the development of any Products, AmTRAN shall provide reasonable prior written notice to VIZIO specifying the exact IP/feature that AmTRAN wishes to include ("Inclusion Notice").  Without VIZIO's expressed written acknowledgement and concurrence with each individual Inclusion Notices, AmTRAN shall not implement and not include any such IP/feature in the design and/or the development of any Products. VIZIO agrees not to unreasonably withhold its acknowledgement or to unreasonably delay the implementation upon acknowledgement.

9.3.    No Reverse Engineering.  Supplier acknowledges that any existing Intellectual Property Rights or New Intellectual Property Rights specific or relating to any and all  Product, Market Differentiator specific or relating to any Product, and/or to VIZIO Technology constitute proprietary and valuable trade secrets of VIZIO, and Supplier shall not, except as expressly permitted by this Agreement

(i)    modify, translate, reverse engineer, decompile, disassemble, derive, rent or lease any of the same;

(ii)    sell, transfer, rent or lease any rights in the same in any form; or

(iii)    remove any proprietary notice, label or marks of VIZIO from the same;

without prior written authorization of VIZIO.

9.4.    Survival.  The provisions of this Section 9 shall survive expiration or termination of this Agreement.

VIZIO Confidential

Initials; Supplier _____ VIZIO _____

Revision: April 2011

## SECTION 10.   CONFIDENTIALITY

10.1.   Mutual Non-Disclosure Agreement.

(a)   The Parties agree to execute and maintain at all times the mutual Non-Disclosure Agreement.

(b)   Notwithstanding any other provision of this Agreement or in the mutual Non-Disclosure Agreement, nothing shall prevent VIZIO from disclosing the existence of or any and all terms of this Agreement with any Governmental Authority, and Supplier hereby consents to disclosure: (1) as required by law, rule or regulation or pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, (2) pursuant to the demand or request of any Governmental Authority having jurisdiction over VIZIO, or (3) to persons who (i) need to know such information for the purposes of evaluating a potential transaction involving the VIZIO, (ii) are informed by VIZIO of the confidential nature of the information, and (iii) agree to act in accordance with the confidentiality provisions of this Agreement to the same extent as if they were parties to a mutual Non-Disclosure Agreement.

10.2.   Supplier Privacy & Security Policy. Supplier shall also comply with VIZIO's Supplier Privacy & Security Policy, attached hereto as **Exhibit I**, which may be amended by VIZIO from time to time upon thirty (30) days' prior written notice.

## SECTION 11.   RELATIONSHIP

11.1.   Independent Contractor. Supplier acknowledges that its performance under this Agreement is as an independent contractor, and not as agent or employee of VIZIO. It retains the right to exercise full control of and supervision over the performance of its obligations hereunder, and in particular over the employment, direction, compensation and discharge of all employees of Supplier and contractors under contract with Supplier in the performance of such obligations.

11.2.   Relationship Created. This Agreement does not, and is not intended to, create any partnership, joint venture, agency, employment, or similar relationship between the Parties and neither Party has the authority to, nor shall it, hold itself out as representative of the other or legally bind the other Party.

11.3.   Non-Exclusive. Nothing in this Agreement is intended to grant any rights of exclusivity to Supplier. VIZIO may engage other manufacturers to supply products similar to the Products.

11.4.   Product Exclusivity. Supplier may only supply the Products to VIZIO. Moreover, Supplier shall not supply, de-badge, re-badge, de-label, re-label, re-condition, re-configure, re-work, transfer, distribute, market, sell, resell, lease or otherwise dispose of Products to any third party. This provision shall survive any termination of this Agreement and does not apply to the standard process and procedures relating to RFC and RFR as reflected in relevant section of this Agreement. Notwithstanding the foregoing, VIZIO may from time to time in writing notify Supplier that it may, subject to the terms of this Agreement, undertake one or more of the foregoing actions with regard to Products with designated third party(ies) and as to

Initials: Supplier _____ /VIZIO _____

Revision: April 2011

certain Products in quantities, for time periods, and/or subject to other conditions as may be specified in such writing.

11.5.   Most Favored Customer.  Supplier will treat VIZIO as a most favored customer. Such most favored customer treatment will include, but is not limited to:

(a)   Supplier will provide all Products and components at prices and quality levels that are equivalent to or better than the lowest prices and highest quality levels of similar products that Supplier produces for third parties.  For each component in the bill of materials for a Product, Supplier will charge VIZIO the lower of (i) the lowest then-available price for such component from agreed-upon qualified vendors, measured at the time of Supplier's pull from its supplier hub; or (ii) the lowest price Supplier charges any third party for such component, whether alone or as part of a finished system or product; and

(b)   Unless prohibited by Law, if at any time should Supplier be unable to provide Product to VIZIO according to the Forecast, then Supplier will promptly notify VIZIO and will favor VIZIO, even to the detriment of Supplier's other customers or Supplier's internal needs, and provide Products to VIZIO to the extent of Supplier's capacity to do so.

## SECTION 12.  ADDITIONAL REPRESENTATIONS

12.1.   Both Parties.  Each Party represents to the other that it has all requisite power and authority to enter into this Agreement and to perform its obligations and exercise its rights hereunder and that the execution, delivery and performance of this Agreement are duly authorized.

12.2.   Further Representations by Supplier.  Supplier further represents, warrants and covenants that:

(a)   Neither this Agreement, the Products, nor Supplier's performance hereunder conflict with any other contract to which Supplier is bound; and

(b)   Supplier is not debarred from providing goods or services to the United States Government and shall inform VIZIO in writing immediately if Supplier is debarred from providing goods or services to the United States Government.

12.5.   Further Product Representations by Supplier.  Supplier further represents, warrants and covenants that:

(a)   the reproduction, sale, offer for sale, importation, use, distribution and sublicense of the Products (alone in a reasonably foreseeable combination of other products or solutions), will not infringe the intellectual property rights or misappropriate the trade secrets of any third party;

(b)   the Products are safe for intended use and for the ordinary purposes for which they are designed;

(c)   the Products will not malfunction or interfere with other systems or other components of systems in which they are used; and

(d)   the Products do not contain asbestos, PCBs, mercury, lead and were not manufactured with CFCs or any other ozone depleting chemicals ("ODC").  Supplier shall promptly provide independent ODC-free certification to VIZIO, upon written request.

Page 21 of 59

Initials: Supplier ___/VIZIO ___

Revision: April 2011

## SECTION 13.   INDEMNIFICATION AND INSURANCE

13.1.   General Indemnification by Supplier.  Supplier shall, at its expense, indemnify, defend, and hold harmless VIZIO, its successors, assigns, officers, directors, agents, representatives, employees, contractors, consultants, customers, resellers, distributors, and end-users, from and against any Losses resulting from Supplier's breach of any representation made in this Agreement, or any injury to or death of any person, or damage to or loss or destruction of any property, arising out of, as a result of, or in connection with (a) any allegation of defect in or any allegation of unsafe feature of any Product, provided said defect or unsafe feature is not the proximate result of any act or omission to act on the part of VIZIO, (b) Supplier's breach of any representation made in this Agreement, or (c) Supplier's failure to comply with any Law or obtain any applicable Permit.

13.2.   Indemnification for Infringement.  Without limiting the foregoing, Supplier shall, at its expense, indemnify, defend and hold harmless VIZIO, its successors, assigns, officers, directors, agents, representatives, employees, contractors, consultants, customers, resellers, distributors, and end-users, from and against any Losses to the extent such Losses are based on a Claim initiated by a third party alleging that the manufacture, use or sale of any Product or component thereof infringes, or contributes to or induces the infringement of, or misappropriates any intellectual property right or other proprietary right of such third party in any country throughout the world (an "**Infringement Claim**"), including with respect to any Product, parts, packaging or printed materials furnished hereunder or any use or exploitation of the Supplier Intellectual Property, except to the extent that such Infringement Claim directly relates to the use of a VIZIO Mark                                    Notwithstanding the aforesaid, Parties agree that Supplier's warranty and indemnification obligations, whether express or implied by Law, shall be excluded only for the portion of any Infringement Claim which would not otherwise have arisen but for:

(a)   any modification of the Products or related Product documentation by VIZIO or its authorized representatives without Supplier's consent;

(b)   the combination, incorporation, or use of the Product, with other unintended materials, parts or accessories not supplied by Supplier; or

In the event that a Claim arises solely out of a component or an independently designated implementation of a new functionality, Parties agree to first, jointly or independently, as appropriate, notify and demand indemnity from such third-party component vendor or service provider.  Thereafter, Parties agree to use good faith efforts to seek contribution from affected third party component and/or service provider(s) in connection with their respective indemnity obligations.  Once obtained, such additional indemnity contribution or efforts shall serve to reimburse the business model equitably and as supplements to the existing indemnity obligations under this section.

VIZIO Confidential

Initials: Supplier ___ VIZIO ___

**Page 44 of 108**

Revision: April 201 |

13.3. Additional Remedies. Subject to the exclusion of Supplier's warranty and indemnification under Section 13.2, if any Product or any parts or materials furnished by Supplier are held in any suit or proceeding to constitute a misappropriation or infringement, or contribute to or induce infringement, and the use or sale of said Product or part or material is enjoined, Supplier shall, at its own expense, promptly either, at VIZIO's option and after discussion with Supplier:

13.4. Indemnification by VIZIO. VIZIO shall, at its expense, indemnify, defend and hold harmless Supplier, its successors, assigns, officers, directors, agents, representatives, employees, and contractors, from and against any Losses resulting from, arising out of, or in connection with any VIZIO Mark or printed material furnished hereunder that misappropriates or infringes, or contributes to or induces the infringement of a copyright, trade secret, mask work, or trademark right of any third party.

13.5. Procedure for Indemnification. Supplier agrees to the terms and conditions of the procedure for indemnification, as set forth in **Schedule B**.

13.6. Offset. In conjunction with Section 5.3, any expenses arising out of, related to or connected with any Claim incurred by VIZIO and not indemnified by Supplier may be offset by any such amount owed against any amount then-owing or to be owed by VIZIO to Supplier under this Agreement or any other agreement.

13.7. Liability Insurance.

Supplier shall provide proof of such insurance, upon VIZIO's request.

13.8. LIMITED LIABILITY: EXCEPT OTHERWISE STATED HEREIN, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR CONSEQUENTIAL OR SPECIAL DAMAGES ARISING FROM ANY CLAIM OR ACTIONS HEREUNDER, BASED ON CONTRACT, TORT OR OTHER LEGAL THEORY. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR DAMAGES FOR ANY CAUSE WHATSOEVER IN AN AMOUNT

. HOWEVER, THE FOREGOING LIMITATIONS IN THIS SECTION SHALL NOT APPLY TO SUPPLIER'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 13.

13.9. Survival. Except for as otherwise specified herein, the provisions of this Section 13 shall survive expiration or termination of this Agreement.

13.10. Participation, Management and Support of Litigation. In the event of any Indemnified Proceeding, Supplier and VIZIO shall, in good faith, work cooperatively in a

Page 23 of 59

VIZIO Confidential

Initials Supplier ___ &VIZIO _M_

Revised April 2011

manner that is not inconsistent with the Participation, Management and Litigation Support Policy attached hereto at Exhibit J.

## SECTION 14. TERM AND TERMINATION

14.1.   Term   This Agreement shall become effective as of the Effective Date and, unless sooner terminated as provided for herein, shall remain in full force and effect

: At the end of the                         , this Agreement shall                         for successive periods                        on each anniversary of the Effective Date thereafter, unless no

either Party

14.2.   Termination after Breach   If either Party is in breach of any of its obligations under this Agreement and such breach continues, without cure to the satisfaction of the non-breaching Party,                               by the non-breaching Party, the non-breaching Party may                                             terminate this Agreement.  The written notice of breach shall state with reasonable particularity the nature of the breach, and the steps required to cure if such breach is by its nature curable.  In the event of an uncured material breach by Supplier

14.3.   Termination upon Insolvency.  In addition to any other rights of termination expressly provided in this Agreement, either Party may immediately cancel any Purchase Order and may immediately terminate this Agreement, in whole or in part: (a) upon the filing of any petition in bankruptcy against the other Party, (b) if the other Party is ordered or adjudged bankrupt, becomes insolvent or goes into liquidation, or generally fails to pay debts as they become due, (c) upon appointment of a receiver or custodian of all or a part of the other Party's assets by any Governmental Authority procedure, (d) upon admission of the other Party to the benefit of any procedure for the settlement of all or substantially all of its debts, or (e) upon seizure of all or a substantial part of the other Party's assets by any Governmental Authority. Notwithstanding anything to the contrary herein, in the event this Agreement is terminated due to VIZIO's insolvency, Supplier may void all transactions, including delivered Products, and to the maximum extent permitted by Law, regain ownership to such Products regardless of legal title.

14.4.   Fulfillment of Forecasts.  Upon expiration, notice of termination, or termination of this Agreement, Supplier will identify (a) the Products that have been shipped, are completed and awaiting shipment, and are work in progress and (b) the inventory of parts, components or other material held to fulfill Supplier's obligations hereunder.  In case of termination of this Agreement without cause by Supplier, to the extent requested by VIZIO in writing, notwithstanding any expiration or termination of this Agreement, Supplier will fulfill any Forecasts previously issued hereunder, and the terms and conditions of this Agreement shall continue to apply to such portion of Forecast already committed by VIZIO to customers as if this Agreement had not expired or terminated.  In such case, at VIZIO's written request, Supplier will ship the Products, and any work-in-progress Products, inventory of parts, components or other

Page 24 of 59

Revision: April 2011

material associated with the Products, at Supplier's unburdened current costs of parts, components or other materials associated with the Products, net of any discounts, rebates, favorable payment terms, and the like.

14.5.   Effect of Termination.  In the event of termination by either Party in accordance with any of the provisions of this Agreement,

Termination shall not relieve either Party of obligations incurred prior to the termination, or obligations which by their terms or nature survive termination of this Agreement.  All licenses granted to Supplier, if any, shall terminate and not survive this Agreement.

### SECTION 15. NOTICES

15.1.   Method of Giving Notice.  All notices or other communications hereunder must be in writing, in English, and communicated through (a) delivery in person, (b) registered or certified mail, return receipt requested and postage prepaid through international delivery service such as Federal Express or DHL, or (c) email or fax.  Notices shall be considered served upon the earliest of (i) actual receipt, irrespective of the method of delivery, (ii) the date stated in the records of the delivery service or on the applicable acknowledgement of receipt, (iii) on the fifth (5th) Business Day after mailing by registered or certified mail, return receipt requested and postage prepaid, or (iv) upon written acknowledgement of receipt, if sent by fax.

15.2.   Addresses for Notices.  For the purposes of notices, the addresses of the Parties are as follows:

If to VIZIO :     VIZIO, Inc.
                39 Tesla
                Irvine, CA 92618
                Attn:
                Fax:
                Email:

                With a copy to:
                Attention: Jerry C. Huang, VP - Legal Affairs
                Fax: 949.777.0785
                Email: Legal@vizio.com

If to Supplier:     _____

                Fax:
                Email:

                With a copy to:
                Attention:
                Fax:
                Email:

Page 25 of 59

Initials: Supplier ___ VIZIO ___

VIZIO Confidential

Revision April 2011

The address to which notices or communications may be given to either Party may be changed by written notice given by such Party to the other pursuant to this Section.

## SECTION 16. PRODUCT RELATED LICENSES

16.3.   Notice.   In the event either Party enters into a license agreement after the Effective Date of this Agreement with a third party for Products-related technology identified on **Exhibit F or Exhibit G**, the licensing Party shall,                          , communicate said license to the extent permitted under the applicable licensing agreement between such party and the licensor to the other Party.  The list of licenses on Exhibit F and G shall be updated periodically to reflect and any all Products-related licenses.

16.4.   Revision.   The Parties may revise, from time to time, **Exhibits F, Exhibit G** and otherwise maintain a ledger showing, between the Parties, the division of known or estimated license fees, royalties, or other estimates accruals for IP claims, or similar charges.  Thereafter, the taking of licenses or the resolution of claims may cause an adjustment to any amounts that were previously estimated on the ledger.  In the event that any accruals maintained on **Exhibit G** are reduced or Supplier's responsibility for such charges is otherwise reduced from what was scheduled on the ledger, the amount of such reduction in accruals shall be credited to VIZIO within thirty (30) days.  Attached hereto and incorporated by reference herein as **Exhibit K** is a copy of IP Accrual Method and Procedure for existing royalty payments and accrual for IP claims.

## SECTION 17. GENERAL

17.1.   Assignment.   VIZIO may assign this Agreement, or any of its rights hereunder or delegate any of its obligations hereunder, without the prior written consent of Supplier.  Either Party may assign this Agreement in its entirety to any successor entity in the event of the sale of all or substantially all of its assets or stock, or its merger, consolidation or reorganization with or into such successor entity, except where the Supplier's successor entity is financially inferior to VIZIO or a direct competitor of VIZIO, then VIZIO's prior written consent is required.

17.2.   Successors and Permitted Assigns.   Subject to Section 17.1, this Agreement shall inure to the benefit of and be binding upon the respective permitted successors and assigns of the Parties.

VIZIO Confidential

Initials: Supplier ___ VIZIO ___

Revision: April 2011

17.3.   No Third Party Beneficiaries.  This Agreement is made solely and specifically between and for the benefit of the Parties hereto and their permitted successors and assigns and no other person whatsoever shall have any rights, interest or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

17.4.   Waivers and Amendments.  Waiver by either Party of any breach by the other Party must be in writing and shall not be deemed a waiver of any other breach.  No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.  This Agreement may only be amended or modified in writing, signed by the duly-authorized representative of the Parties.

17.5.   Exhibits.  All of the Exhibits, Schedules and other attachments to this Agreement are incorporated herein by this reference and are a part of this Agreement for all purposes.

17.6.   Interpretation

(a)     The terms and conditions of this Agreement shall govern all Purchase Orders and shall control over any terms or conditions of any order form, confirmation, acknowledgement, acceptance or other such document relating to the supply of Products by Supplier to VIZIO.

(b)     The headings and captions used in this Agreement are inserted for convenience and ease of reference only, and are not to be considered in the construction or interpretation of any provision of this Agreement.

(c)     Reference to the singular includes the plural and the plural includes the singular.

(d)     "Including" and similar expressions are not words of limitation, whether or not non-limiting words (such as "without limitation" or "but not limited to" or words of similar import) are used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.

(e)     References to "this Agreement" or to any other document referred to in this Agreement, shall mean such document as amended, varied, supplemented, modified or novated from time to time.

(g)     The definitive version of this Agreement shall be in English.  Translations may be made as desired, but the English language version of this Agreement shall control.

17.7.   Cumulative Remedies.  Any rights of cancellation, termination, injunctive relief, liquidated damages or other remedies prescribed herein are cumulative and are not intended to be exclusive of any other remedies to which the injured Party may be entitled at law or equity (including but not limited to remedies of specific performance and cover).  The use of one or more available remedies shall not bar the use of any other remedy for the purpose of enforcing this Agreement, provided that a Party shall not be entitled to inconsistent remedies.

17.8.   Severability.  If any provisions of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not invalidate or render unenforceable the entire Agreement, but rather the entire Agreement shall be construed as if not containing the

VIZIO Confidential

Initials: Supplier _____ VIZIO _____

Revision: April 2011

particular invalid or unenforceable provisions, and the rights and obligations of the Parties shall be construed and enforced accordingly.

17.9.   Survival.  Any provisions, or parts thereof, of this Agreement which by their express terms or by their nature should survive the completion of performance, cancellation, expiration or termination of this Agreement hereunder shall so survive.

17.10.  Governing Law.  This Agreement shall be interpreted, construed and governed by the internal laws of the State of California, USA, without giving effect to its conflict of laws principles.  The United Nations Convention on Contracts for the International Sales of Goods shall not apply.

17.11.  Jurisdiction.  All disputes or controversies between the Parties arising out of, relating to, or in connection with this Agreement, or for the interpretation or enforcement thereof, shall be subject to the sole and exclusive jurisdiction of the state or federal courts located in Orange County, California, USA.

17.12.  Force Majeure.  If any performance of this Agreement is delayed, prevented, restricted or interfered with by reason of Force Majeure, then (a) the Party whose performance is interfered with, shall give prompt written notice to the other Party of such event and shall be excused from performance hereunder to the extent interfered with; provided, however, that the Party whose performance is interfered with shall use its best efforts to continue performance whenever possible, and (

The Party seeking to be excused from performance may not receive the benefit of this Section with respect to an event, circumstances or omission which constitutes, or results from, a breach by such Party of a representation, warranty or covenant contained in this Agreement or which otherwise gives rise to an indemnity obligation under this Agreement.

17.13.  Further Assurances.  The Parties agree to execute and deliver all documents and instruments and to perform such additional acts as the other Party may reasonably request, or as may reasonably be necessary or appropriate, to effectuate, consummate, perform or satisfy any of the terms or conditions of this Agreement.

17.14.  Entire Agreement.  This Agreement represents the entire agreement and understanding of the Parties regarding the subject matter hereof, supersedes all prior and contemporaneous agreements and understandings between the Parties with respect to such subject matter.

17.15.  Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be effective as and shall constitute an original and all of which together shall constitute one and the same instrument.  It shall not be necessary for each Party to execute all counterparts, provided that each Party has executed at least one counterpart.

17.16.  Publicity.  Neither Party shall make any use of the other Party's name, trademarks or any other identification of the other Party or any of its affiliated companies in its advertising, promotional efforts, or issue any press release or similar public statement regarding the other Party or this Agreement without the other Party's prior written consent.

VIZIO Confidential

Initials: Supplier ___ /VIZIO ___

Revision: April 2011

Revision: April 2011

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives.

AmTRAN Technology Co., Ltd.

By: _Franku_

Title: _President_

Date: _____

VIZIO, INC.

By: _Rob Rl, CTO_

Title: _CTO_

Date: _April 10, 2012_

*[Signature page to VIZIO, Inc. Standard Supply Agreement]*

VIZIO Confidential

Initials: Supplier _____/VIZIO _____ 

**Page 52 of 108**

Revision: April 2011

**EXHIBIT A**
PROCESS



A.1

Exhibit A-1 –

A.2.a

Exhibit A.2.a –

A.2.b

Exhibit A.2.b –

Initials: Supplier ___/VIZIO ___

VIZIO Confidential

Revision: April 201

**EXHIBIT B**

PROCESS

For TV Products



Exhibit B -

VIZIO Confidential

Initials: Supplier ___ VIZIO

**Page 54 of 108**

Revision: April 2011

## EXHIBIT C
### PROCESS

C.1



Exhibit C.1 -

_____

<u>C.2</u>



Exhibit C.2 -

Page 33 of 59

VIZIO Confidential

Initials: Supplier  VIZIO

Revised April 201

## EXHIBIT D
### WARRANTY SCHEDULE

Warranty Tables are included as part of                    processes in Exhibits A, B and C.

... Insert the Product Specific Warranty Schedule here .....

Initials: Supplier /. VIZIO

VIZIO Confidential

Revision: April 2011

**EXHIBIT E**
SPECIFICATIONS COVER SHEET

Customer:  VIZIO INC.
Supplier:
Product Identification Number:
Product Description:
Customer and Supplier agree to the Specifications for the Product attached to this cover sheet as of _____, 20___.

[Name of Supplier]

By: _____

Title: _____
VIZIO INC.

By: _____

Title: _____

Page 35 of 59

VIZIO Confidential

Initials: Supplier _____ VIZIO 

**Page 57 of 108**

Revision: April 2011

**EXHIBIT F**

| | |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Initials: Supplier _____ VIZIO _____

VIZIO Confidential

Revision: April 2011

**EXHIBIT G**

VIZIO Confidential

Initials: Supplier _____ VIZIO _____

Revision: April 2011

## EXHIBIT H

Open Source Software

This product contains the following open source software packages, which are subject to their respective licenses.

Initials: Supplier  VIZIO

VIZIO Confidential

**Page 60 of 108**

Revision: April 2011

Initials: Supplier ⫶⫶VIZIO

VIZIO Confidential

**Page 61 of 108**

Revision. April 2011

VIZIO Confidential

Initials: Supplier_____VIZIO

Revision: April 2011



VIZIO Confidential

Initials: Supplier _____ VIZIO _____

**Page 63 of 108**

Revision: April 2011

VIZIO Confidential

Initials: Supplier _____ VIZIO _____ 

**Page 64 of 108**

Revision: April 2011

## EXHIBIT I

### VIZIO Supplier Privacy & Security Policy

1.    Purpose and Overview

1.1    VIZIO, Inc. ("VIZIO") from time to time enters into business relationships that require VIZIO's Supplier to have access to information (including confidential or proprietary information including but not limited to business plan, business model, product roadmap, design, prototypes, engineering samples, software, firmware, source codes, financials, customer information and third party confidential information, as related to VIZIO) and information systems and/or third party's confidential information disclosed in connection with such business relationship with Supplier (collectively referred to as "Confidential Information" or "Information Systems"). This access presents different risks to VIZIO including (a) an enhanced risk of unauthorized disclosure or use of Information, (b) an increased risk of loss each time an additional party is granted access to Information, and (c) an increased risk of loss through non-compliance with applicable law. For example, a Supplier with access to VIZIO's Information Systems represents a potential point of entry for unauthorized actors, malicious code or a variety of other threats. This Supplier Privacy and Security Policy (hereinafter "Policy") is part of VIZIO's effort to work with its Supplier community to reduce these risks to acceptable levels. The Policy therefore establishes a minimum set of controls that must be used to protect VIZIO Confidential Information and, where applicable, VIZIO's and Supplier's Information Systems.

1.2    Any Supplier that receives, uses, stores, processes and/or transmits VIZIO Confidential Information must use commercially reasonable information security controls to ensure the confidentiality, integrity and availability of such Confidential Information. For purposes of this Policy, VIZIO Confidential Information will have the same meaning as is assigned to it by any relevant and applicable agreements between VIZIO and Supplier. Regardless whether this information is delivered in person, stored on, processed on, or transmitted by computer systems owned or licensed by VIZIO or computer systems owned or licensed by Supplier. Supplier shall use commercially reasonable information security controls to (a) protect any Confidential Information and/or VIZIO Information Systems to which it has access during the performance of its obligations under this Agreement and (b) to protect any Supplier Information Systems on which VIZIO Confidential Information is stored, processed or transmitted. The information security controls implemented by Supplier will include both the *Confidential Information and Security Wall Policy*, the *Minimum Information Security Controls*, as provided herein below and any additional information security controls deemed reasonable or prudent by Supplier. Supplier's access to and/or use of any Confidential Information and Information Systems is conditioned upon Supplier's continuing compliance with this Policy.

2.    Guidelines for Identifying Confidential Information

VIZIO Confidential

Initials: Supplier ____ VIZIO ____

Revision April 2011

In identifying Confidential Information (including confidential, proprietary and trade secret information), Supplier is to be guided by the following criteria and standards:

2.1.  The form in which the information and materials exist does not govern whether it is proprietary and constitutes a trade secret or otherwise comprises Confidential Information. Confidential Information can be included in almost any form, including but not limited to publications, memoranda, correspondence, meeting minutes, computer discs, software programs, documentation, Emails, customer reports, risk management reports, plans, business plans, schematic diagrams, marketing plans and materials, demographic information, customer lists, user lists, input forms, the company policies themselves, user statistics, referral sources, supplier lists, engineering samples, demo units, system design structure, architectural plans, expansion plans, contracts, agreements, leases, licenses, financing documents, financial plans and data, source codes, algorithms, business models and structures, negotiations, and virtually any other form that contains any information that is of strategic or confidential importance to VIZIO and/or Supplier.

2.2  Information is clearly proprietary and shall be considered Confidential Information if it is of strategic advantage or importance to VIZIO, if it could have external consequences to VIZIO whether negative or positive if released, or if its release could give a strategic advantage to a competitor or take a strategic advantage away from VIZIO.

2.3  Supplier is responsible for identifying and protecting Confidential Information received or developed on behalf of VIZIO and any trade secret information in existence.

2.4  This procedure for identifying and designating Confidential Information does not imply that information that has not been so designated is not a trade secret, of a proprietary nature or otherwise not Confidential Information. The above mechanism has been developed as a means for the Supplier to track and control such Confidential Information. Supplier is bound to the requirements that they treat all Confidential Information as confidential as required by this Policy and any other existing agreements between the parties.

3.  Confidential Information and Security Wall Policy

3.1  The aim of the Confidential Information and Security Wall Policy ("CIS Wall Policy") is to ensure that Supplier complies with policies and procedures regarding restrictions on the flow of Confidential Information between (a) Supplier's employees, agents, contractors, and consultants who have access to Confidential Information, including but not limited to product managers, engineers, technical advisors and account executives ("Dedicated Personnel") and the rest of Supplier organization, (b) Supplier and certain affiliated entities and their related personnel, and (c) Supplier and any other third party including but not limited to Supplier's other customer(s).

Initials: Supplier ___ /VIZIO ___

Revision: April 2011

3.2    All affected Supplier personnel shall make themselves familiar with this CIS Wall Policy.  Dedicated Personnel within CIS Walls or likely to possess Confidential Information must certify on an annual basis that they have read and understood this CIS Wall Policy.

3.3    SUPPLIER IS RESPONSIBLE FOR COMPLYING WITH THIS CIS WALL POLICY.  FAILURE TO COMPLY WITH THIS CIS WALL POLICY BY SUPPLIER WILL BE CONSIDERED A MATERIAL BREACH OF ALL CONTRACTS BETWEEN VIZIO AND SUPPLIER.

3.4    CIS Walls

3.4.1  A "CIS Wall" is an arrangement designed to restrict the flow of (a) Confidential Information between employees and departments within Supplier's organization and (b) Confidential Information between Supplier and certain affiliated entities or any third parties.  It is an ethical, security barrier to avoid any conflicts of interest, use, misuse and/or unauthorized disclosure or sharing of Confidential Information that may result from the intended or unintended disclosure of such Confidential Information.  Under no circumstances may there be any disclosure or sharing of Confidential Information with Supplier's other customer(s) and/or Supplier internal private label or branded team.

3.4.2  Accordingly, Supplier is to establish the following CIS Walls between:

-  Dedicated Personnel and other individuals or departments within Supplier's organization; and
-  Supplier and affiliated entities, including and related personnel.

A CIS Wall must exist between members of the Dedicated Personnel and the rest of Supplier organization. This CIS Wall is designed to isolate the Dedicated Personnel in order to restrict the dissemination of Confidential Information obtained by the Dedicated Personnel on a "need to know" basis.

3.4.3  Pursuant to this CIS Wall, a "wall" must be maintained around the team working on VIZIO confidential assignments.  This means that any information acquired during the course of a confidential assignment should be considered Confidential Information and must be held on a "need to know" basis. Under no circumstances may such information be communicated to any other person (other than the corresponding VIZIO personnel working on the project), including but not limited to any other employee of Supplier unless communication of such information has been specifically approved by VIZIO's management.

VIZIO Confidential

Initials: Supplier _____ /VIZIO _____

Revision: April 2011

3.4.4   All Supplier employees, contractors, agents and/or representatives outside the Dedicated Personnel group are also required to immediately report any instances where they have become privy to information regarding a confidential Consulting assignment.  In order to enable Supplier to maintain appropriate records as to when, why and who was involved in an assignment, any non-Dedicated Personnel receiving or initiating such contact should notify his or her superior immediately and Supplier should also notify VIZIO.

3.4.5   Any individual brought "over the wall" with respect to a confidential assignment must adhere to these procedures prior to contacting anyone else within Supplier organization in connection with a confidential assignment.

3.4.6   This CIS Wall is supported by the following procedures:
- Physical separation of Dedicated Personnel from other Supplier personnel;
- Physical separation of VIZIO hardware, demo, sample or engineering units and/or any other tangible items containing Confidential Information (individually or collectively "Products") from others;
- Physical separation of engineering room(s) and sample room(s) containing Products ("Controlled Rooms") from others;
- Limiting computer access to Confidential Information on Supplier network;
- Restricting access to Controlled Rooms, Products and Confidential Information by others outside the Dedicated Personnel group;
- Isolation of Dedicated Personnel from projects for Supplier or other Supplier customers; and
- Prohibition of Dedicated Personnel from participation in any project(s) of Supplier or other Supplier customers during, and 2 years after the conclusion of, any VIZIO confidential assignments.

4.   Receipt of Confidential Information from a Third Party

4.1   No Confidential Information of any other party, as related to VIZIO or its projects, may be released to Supplier or be accepted by Supplier without receiving prior approval and authorization from VIZIO.  Such information may only be received if there is a valid business purpose for the same.  If the other party requests that a Confidentiality Agreement be executed, the Agreement must first be approved by VIZIO legal counsel, and executed by a corporate officer.

4.2   Once the confidential information of a third party is received, it shall be provided with the same level of protection that Supplier affords to its own confidential information and in no case will the level of protection afforded be less than a reasonable level.  Inter-company disclosure of third party information shall be limited to those employees that have a bona fide reason to know in connection with the contemplated transaction or legal relationship.  Third party confidential information shall be subject to the terms of these policies once received.

Initials: Supplier ___ VIZIO ___

Revision April 2011

5.     Safeguarding Confidential Information

To safeguard Confidential Information, Supplier should observe the following minimum guidelines in addition to the more restrictive security measures required above:

5.1     Special confidentiality arrangements may be required for certain parties, including outside business associates and governmental agencies and trade associations, seeking access to material non-public information.

5.2     Any restriction placed on the disclosure or use of Confidential Information by VIZIO or pursuant to agreement with any third parties must be observed, except when disclosure is authorized by VIZIO or such third party.

5.3     Papers relating to non-public matters should be appropriately safeguarded.

5.4     Appropriate controls for the reception and oversight of visitors to sensitive areas should be implemented and maintained.

5.5     Document control procedures, such as numbering counterparts and recording their distribution, should be used where appropriate.

5.6     Sensitive business conversations, whether in person or on the telephone, should be avoided in public places and care should be taken when using portable computers and similar devices in public places.

5.7     E-mail messages and attachments containing material non-public information should be treated with similar discretion (including encryption, if appropriate).

6     Information System Control

6.1     Access & Disposal

6.1.1   Termination of Access.  VIZIO will have the right to immediately and unconditionally revoke Supplier's access to VIZIO's Confidential Information and/or Information Systems with or without cause.

6.1.2   Information Disposal.  Unless otherwise agreed in writing, upon the written request of VIZIO Supplier will destroy, and certify in writing that Supplier has destroyed, all VIZIO Confidential Information received pursuant to such agreement. Nothing in this section

Initials: Supplier ___ /VIZIO ___

Revision: April 2011

will prevent Supplier from maintaining information as required by law or any regulatory authority to which Supplier is subject.

6.2     Minimum Information Security Controls

This section specifies the minimum Information Security Controls ("Security Controls") that Supplier must implement and maintain to meet its obligations under the Agreement.

6.2.1     Application of Security Controls. These Security Controls apply to Supplier personnel, processes and/or technology involved in the performance of the Services or Supplier's obligations under agreement(s) with VIZIO.

6.2.2     Supplier's information security policy will be reviewed not less than annually, and whenever significant changes occur, to ensure its continuing suitability, adequacy, and effectiveness.

6.2.3     Supplier will appropriately manage its information security functions and activities. Supplier will maintain the security of its information and information processing facilities that are accessed, processed, communicated to, or managed by external parties.

6.2.4     To reduce the risk of theft, fraud or misuse of facilities, Supplier will ensure that employees, contractors and third party users understand their responsibilities and are suitable for the roles for which they are considered. Supplier will ensure that all employees, contractors and third party users are aware of information security threats and concerns, their responsibilities and liabilities, and are equipped to support organizational security policy in the course of their normal work, and to reduce the risk of human error.

6.2.5     Supplier will maintain and follow a formal disciplinary process for employees who commit a security breach. Supplier will ensure that its employees, contractors and third party users exit the organization or change employment in an orderly manner. Access rights of all Supplier employees, contractors and third party users to information and information processing facilities will be removed upon termination of their employment, contract or agreement, or adjusted upon change.

6.2.6     Supplier will prevent unauthorized physical access, damage and interference to its premises, Controlled Rooms and Confidential Information. Supplier will use appropriate equipment security measures to prevent loss, damage, theft or compromise of assets and interruption to its activities. Supplier will check all items of equipment containing storage media to ensure that any sensitive data and licensed software has been removed or securely overwritten prior to disposal.

VIZIO Confidential

Initials: Supplier ___ / VIZIO ___

Revision: April 2011

6.2.7    Supplier will ensure the protection of information in networks and the protection of the supporting infrastructure and segregation of Confidential Information from the rest. Supplier networks will be adequately managed and controlled, in order to be protected from threats, and to maintain security for the systems and applications using the network, including information in transit.

6.2.8    Supplier will control access to information based on business requirements. Supplier will ensure authorized user access and prevent unauthorized access to information systems. Supplier will restrict and control allocation and use of access privileges. Supplier will prevent unauthorized user access, and compromise or theft of information and information processing facilities. Supplier will prevent unauthorized access to networked services. Supplier will appropriately segregate groups of information services, users, and information systems on networks.

6.2.9    Supplier will ensure that security is an integral part of information systems. Supplier will prevent errors, loss, unauthorized modification or misuse of information in applications. Supplier will protect the confidentiality, authenticity or integrity of information by cryptographic means when appropriate. Supplier will use commercially reasonable encryption technology to protect personally identifiable information on laptops or other portable devices.

6.2.10    Supplier will ensure information security events and weaknesses associated with information systems are communicated in a manner allowing timely corrective action to be taken. Supplier will report information security events through appropriate management channels as quickly as possible. Supplier will immediately notify VIZIO upon discovery of any incident in which VIZIO Confidential Information or Information Systems are, or may have been, accessed without authorization. Notice must be provided to Supplier's business contact within VIZIO and by mail to: VIZIO's Legal Department.

6.2.11    Supplier will comply with applicable laws, regulations, contractual obligations, and specified security requirements. Supplier will ensure data protection and privacy as required in relevant legislation, regulations, and, if applicable, contractual clauses. Supplier will comply with VIZIO's Privacy Policy, as amended and updated from time to time. VIZIO's Privacy Policy is available at http://www.vizio.com/privacy/.

7.    Indemnification.

7.1    Supplier shall defend, indemnify, and hold harmless VIZIO, together with the other party's employees, directors, officers, shareholders, corporate affiliates, successors and assignees (collectively, the "Indemnified Parties"), from and against any and all claims, actions, causes of action, demands, judgments, liabilities, damages, losses, injuries, costs and expenses (including, without limitation, reasonable attorneys' fees and court costs) (collectively, "Liabilities") arising out or relating to any breach by Supplier, its Dedicated Personnel, or

VIZIO Confidential

Initials: Supplier ___ VIZIO ___

Revision: April 2011

affiliated parties based on or otherwise concerning the breach or alleged breach by the Supplier of any provision of this Policy, the CIS Wall Policy, or any of Supplier's representations or warranties set forth in this Policy. Supplier's indemnification herein is not subject to any limitations on liability even if said limitations are set forth in another written agreement between Supplier and VIZIO.

VIZIO Confidential

Initials: Supplier ___ VIZIO ___

Revision: April 2011

## EXHIBIT J

Participation, Management and Litigation Support Policy

(To be provided.)

Page 51 of 59

Initials: Supplier ⟋. ⱯVIZIO _M5_

VIZIO Confidential

**Page 73 of 108**

Revision: April 2011

## EXHIBIT K

### IP & Legal Accrual Method and Procedure

A. Indemnification and Legal fees.

(i) Parties agree to exchange preliminary quarterly itemized legal estimates, which shall only consist with the Claim(s) with respect to any Products supplied by Supplier and consistent with Supplier's Indemnity obligations under the Agreement,

For the purpose to have accurate accrual on legal spending, parties agree to use the final combined VIZIO and AmTRAN quarterly legal estimates in a fix dollar amount to be accrued in the Business Model. Parties shall use reasonable efforts to modify the legal estimates if there is material changes needed during the quarter.

(ii) Quarterly reconciliation shall be completed within _____ after the end of following quarter, and both parties shall equally split any balance in the accrual, equally share in any deficit, or other means by mutual agreement.

(iii) Parties agree that such itemized legal estimates shall also include any third party claims and/or counter claims against VIZIO which may be related to affirmative claim(s) made by VIZIO and/or Supplier against such third party provided that the claims made by VIZIO and/or Suppliers has been promptly prior discussed and agreed in good faith.

B. IP Accrual.

(i) Supplier and VIZIO acknowledge and agree that any amount of the IP accrual and accrual split in the Business Model shall be subject to mutual discussion and agreement. Parties agree to review the accrual in a quarterly basis, and VIZIO further agrees to provide the reasonable advance notice for future licenses, including but not limited to the license demands by patentees. Parties further agree that:

If an IP accrual line item becomes an actual license, any such finalized license IP accrual shall be moved to VIZIO's side except otherwise being agreed separately. Notwithstanding the foregoing, if any licenses which both parties holds separate agreements simultaneously, the IP accrual shall be reside on the side with the lower cost; or if the cost is the same, then accrual to be agreed upon by the parties. Provided that Supplier fulfills all obligations under the applicable license agreement(s), Supplier shall, during the term of such license agreement as stipulated above, be relieved from its indemnity obligations under the Agreement with respect to such license.

(ii)

_____ such prior IP accruals will be used on a pro-rata basis (based on notice date) for future resolution of the associated pending claims and/or litigations.

VIZIO Confidential

Initials: Supplier ___ / VIZIO 

**Page 74 of 108**

Revision: April 2011

### EXHIBIT L
Transition Procedures
To be provided

Revision, April 2011

**EXHIBIT M**
Quality Assurance Procedures

Initials: Supplier ___ VIZIO ___

Revision: April 2011

## EXHIBIT N

### Product and Tooling

1. Tooling Amortization.
    A. With respect to tooling cost for projects that have been commercialized, i.e., kicked off, MP or launched, but have not been fully amortized before

    B. With respect to tooling cost for projects that have been kicked-off but terminated prior to MP:
    1.

    C. Parties agree to review the status of tooling amortization on a quarterly basis.

Initials: Supplier ___ VIZIO ___

VIZIO Confidential

**Page 77 of 108**

Revision. April 2011

## SCHEDULE B
### Indemnification Procedure

1. <u>Notice</u>. The party seeking indemnification ("**Indemnified Party**") shall promptly notify the party to provide indemnification ("**Indemnifying Party**") in writing of any Claims. The lack of timely notice by VIZIO to Supplier of a Claim is not a material breach of this Agreement and would only diminish Supplier's obligations to the extent that such delay directly, proximately, materially and adversely prejudices Supplier's defense of the Claim.

2. <u>Indemnified Proceedings</u>. The Indemnified Party shall have control of the defense of such Claims, including selection of counsel that is reasonably satisfactory to such Indemnifing Party. Indemnified Party shall notify and consult with Indemnifying Party in connection with counsel selection and litigation strategy in good faith under an appropriate JDA or CIA.

The Indemnified Party shall have the right to separately employ counsel in any such Claim, but the fees and expenses of such counsel shall be at its own costs unless:

   a. the employment of counsel by the Indemnified Party at the expense of the applicable Indemnifying Party has been authorized in writing by the Indemnifying Party;

   b. the Indemnified Party reasonably concludes in its good faith that there may be a conflict of interest, or that there may be additional defenses, claims, counterclaims, or causes of action available to the Indemnified Party (collectively, "**Conflicts**");

   c. the Indemnifying Party did not employ counsel reasonably acceptable to the Indemnified Party to assume the defense of such Claims; or

   d. the counsel employed by the Indemnifying Party fails to reasonably conduct the defense of such Claims and the failure will prejudice the defense of the Claims.

   e. If any of (a) – (d) apply, the fees and expenses of counsel for the Indemnified Party shall be at the expense of the Indemnifying Party. Only one counsel shall be retained by all Indemnified Parties with respect to any Claim, unless counsel for any Indemnified Party reasonably concludes in good faith that there may be Conflicts.

Page 57 of 59

VIZIO Confidential

Initials: Supplier _____ VIZIO _____

Revision: April 2011

3.  Settlement.  Without the prior written consent of the Indemnified Party, the Indemnifying Party shall not settle or compromise, or consent to the entry of any judgment in, any pending or threatened Claim, unless such settlement, compromise, consent or related judgment

4.  VIZIO Settlement.  In any pending or threatened Claim where VIZIO controls the defense, Supplier agrees that VIZIO may settle or compromise, or consent to the entry of any judgment without the prior written consent of Supplier, unless

Page 58 of 59

Initials: Supplier _____ VIZIO _____

Revision: April 2011

6. <u>Good Faith</u>.  All conclusions, determinations, and similar procedures required to be conducted in good faith in this Schedule shall be determinative unless a court determines it was not reasonable and not in good faith.

7. <u>Accrual Process</u>.  To be governed by Exhibit K.

Initials: Supplier ____ VIZIO ____

VIZIO Confidential

# EXHIBIT  2

**Page 81 of 108**



PMD/031009
00031048v7

# HDREPAIR.COM CORPORATION

## MAINTENANCE SERVICES AGREEMENT

This Maintenance Services Agreement ("Agreement") is made and entered into effective as of January 15, 2009, by and between HDREPAIR.COM CORPORATION., a Florida corporation ("HDREPAIR") and the AmTRAN TECHNOLOGY COMPANY, Ltd a Taiwan corporation ("AmTRAN") and ASEV DISPLAY LABS, a California corporation with a principal place of business at 14330 Monte Vista Chino, California 91710, together with its affiliates, successors and assigns ("ASEV") (collectively, AmTRAN and ASEV are the "CUSTOMER").

### Recitals:

A.      HDREPAIR is a leading provider of information technology related services, including maintenance services on third party Flat Panel LCD and Plasma Televisions.

B.      CUSTOMER is in the business of manufacturing and distributing VIZIO Flat Panel LCD and Plasma Televisions and related products (the "Products").

C.      CUSTOMER desires to engage HDREPAIR to provide maintenance services on certain Products for CUSTOMER and to appoint HDREPAIR as an authorized service provider for the Products according to the terms and conditions contained herein.

### Agreement:

NOW THEREFORE, in consideration of the premises and mutual covenants herein contained and for other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged by all parties, the parties hereby agree as follows:

1.      **Scope of Duties.**

(a)      Subject to the terms and conditions of this Agreement, CUSTOMER hereby engages HDREPAIR to provide the services ("Services") described in Exhibit A attached to this Agreement and made a part hereof ("Service Appendix"), and grants HDREPAIR the non-exclusive right to (i) identify itself as an authorized service provider for the Products and (ii) to use the "Marks" (defined in Section 5) in the promotion and delivery of the Services. Any inconsistency between this Agreement and the provisions of the Service Appendix shall be construed and resolved as provided in this Agreement.

(b)      HDREPAIR shall provide qualified personnel ("Service Representatives") to perform the Services within the Service Territory in accordance with the terms set forth in the Service Appendix, regardless of where the Products are sold and by whom.   Upon

CUSTOMER's request, HDREPAIR may on a case-by-case basis elect to provide Service Representatives to perform the Services outside of the Service Territory at an additional fee as agreed to by the parties prior to the delivery of the Services.   CUSTOMER acknowledges and agrees that HDREPAIR may subcontract performance of the Services to qualified affiliated subcontractors and HDREPAIR or such subcontractor may subcontract performance of the Services to qualified independent contractors.   The "Service Territory" shall mean the continental United States and the major metropolitan cities of Alaska, Hawaii and Puerto Rico, and specifically excludes the Caribbean Islands, United States coastal and Inter coastal islands which are not bridge accessible, Hawaii and Puerto Rico, and such other countries or geographic territories as the parties may from time to time mutually agree upon, and as set forth in this Agreement, as amended or supplemented.

(c)    HDREPAIR shall meet the service response times and other performance criteria set forth in the Service Appendix.   HDREPAIR and the Service Representatives shall at all times adhere to all reasonable rules and regulations of CUSTOMER with regard to safety, security or otherwise.   All Service Representatives shall at all times comply and adhere to HDREPAIR's Policy and Procedures Manual as may be in effect from time to time.

(d)    Unless otherwise approved or provided by CUSTOMER, or used for out-of-warranty end users, HDREPAIR shall use only CUSTOMER supplied parts and accessories when performing the Services.   In the course of HDREPAIR's performance of the Services, CUSTOMER, in consultation with HDREPAIR and/or its Service Representatives when appropriate, shall determine which new or replacement parts, if any, are required for HDREPAIR to perform the Services.   CUSTOMER shall provide parts to HDREPAIR using a commercial carrier of its choice, and CUSTOMER shall pay all associated shipping and handling costs. Parts will be shipped to the most convenient location as designated by HDREPAIR, as follows: (i) if the service location of the subject Product is located within a particular Service Representative's designated service area, then any and all parts shall be shipped directly to the location of such Service Representative; (ii) if the service location of the subject Product is located outside of the applicable Service Representative's designated service area, then any and all parts shall be shipped directly to the closest retail courier hold for pick-up center designated by HDREPAIR, if any, and if none, then any and all parts shall be shipped directly to the location of such Service Representative; (iii) if no Service Representative has been confirmed by HDREPAIR for a particular service call at the designated deadline for submission of a shipping address by HDREPAIR, then any and all parts shall be shipped directly to the closest retail courier hold for pick-up center retail outlet designated by HDREPAIR, if any, and if none, then any and all parts shall be shipped directly to the location of the subject Product being scheduled for service and CUSTOMER's end-user.

HDREPAIR shall not be responsible for any delay, damage or inability to complete Services due to the receipt of a wrong, damaged or defective part shipped by CUSTOMER.   If HDREPAIR or its Service Representative is directly responsible for damage to any CUSTOMER supplied part, then HDREPAIR shall have fifteen (15) business days to review, investigate and confirm responsibility.   Upon HDREPAIR's good faith determination that HDREPAIR or its Service Representative is directly responsible for the damaged part(s), HDREPAIR shall reimburse

{Client Files\H122\002\00031048.DOC V7}

CUSTOMER at its cost for such part(s).  HDREPAIR shall comply with the commercially reasonable policies and procedures of CUSTOMER regarding the handling and return of parts supplied by CUSTOMER, however, CUSTOMER shall pay all associated costs.

(e)    HDREPAIR shall design and implement a certification process for its Service Representatives, and CUSTOMER agrees that it may enter into an agreement with HDREPAIR or its affiliate to maintain and operate such certification process at a future date.

2.    **Manner of Performance; Limited Warranty.**  HDREPAIR warrants that the Services performed hereunder will be accurately and efficiently rendered in accordance with generally accepted industry standards and at no less than the standards set forth in Service Appendix I and Service Appendix II, and that any parts supplied by CUSTOMER will be installed according to generally accepted industry standards and at no less than the standards set forth in Service Appendix I and Service Appendix II.   Such limited warranty will survive for a period of thirty (30) days following HDREPAIR's completion of the Services specified in the Service Appendix and shall not cover the failure of any parts installed by HDREPAIR.

3.    **Fees.**

(a)    In full consideration for the Services provided within the Service Territory hereunder, CUSTOMER agrees to pay HDREPAIR the fees specified in Exhibit B ("Fee Schedule").   HDREPAIR will submit an invoice to CUSTOMER twice monthly for all uninvoiced service requests completed (i) between the first and the 15th of each month, and (ii) between the 16th and the end of each month.   Such invoices are payable net thirty (30) days from the receipt.   Within ten (10) business days of receipt of invoice, CUSTOMER shall notify HDREPAIR in writing of any disputed fees for any Services billed on such invoice. CUSTOMER shall have the right to hold the related payment until the parties are able to resolve such dispute, provided, however, that any invoice which is not disputed within such ten (10) business day period shall be considered approved and shall be paid.   CUSTOMER agrees to pay HDREPAIR all fees via wire transfer.  In the event CUSTOMER does not pay the entire amount of such invoice(s) when due, interest shall be payable by CUSTOMER to HDREPAIR on the unpaid balance at the rate of one and one-half percent (1.5%) per month except the disputed payment.

(b)    CUSTOMER is eligible to receive the applicable volume discount on fees as set forth on the Fee Schedule, provided, however, CUSTOMER much provide HDREPAIR with prior written notice at least fifteen (15) days before to the start of the month in which such volume discount shall be effective, and CUSTOMER agrees to guarantee the number of minimum calls invoiced monthly to be eligible for any volume discount pursuant to the Fee Schedule for a period of six (6) months (the "Discount Period").   In addition to any standard service fees, CUSTOMER shall be invoiced by HDREPAIR and shall pay HDREPAIR for any month during a Discount Period in which the invoiced call volume falls below the required minimum an amount equal to the difference between the applicable minimum number of required calls required for the volume discount minus the actual number of calls invoiced, multiplied by the per call fee at the applicable discounted invoice price.

{Client Files\H122\002\00031048.DOC V7}

(c)     Any fees for Services provided to CUSTOMER by HDREPAIR outside of the Service Territory shall be set by the mutual agreement of the parties and shall be payable net fifteen (15) days from the invoice date, unless otherwise agreed by the parties.

4.     **Nature of Relationship.**     The parties acknowledge and agree that HDREPAIR is an independent contractor to CUSTOMER and nothing in this Agreement shall be construed to constitute the parties as agents, partners or joint venturers.   The manner in which Services are rendered hereunder by HDREPAIR, its Service Representatives, employees and independent contractors shall be within HDREPAIR's sole control and discretion subject to the provisions of this Agreement.   Subject to the provisions of this Agreement, HDREPAIR shall determine which of its Service Representatives, employees or independent contractors shall perform services pursuant to this Agreement, after giving consideration to each such person's knowledge and experience and continuity during the performance of Services pursuant to this Agreement. Neither party shall be responsible for the other party's acts or omissions or the acts or omissions of the other party's employees or independent contractors while performing pursuant to this Agreement.   Neither party will have the authority to represent, obligate or bind the other in any way without the express prior written authority of the other party.

5.     **Use of Marks and Related Rights.**

(a)     HDREPAIR shall identify itself and its Service Representatives as authorized service providers or representatives for Products with such signage, name plates, badges or other authorized displays as are consistent with standards established by VIZIO and CUSTOMER from time to time and approved by VIZIO and CUSTOMER with respect to any display of the Marks.

(b)     CUSTOMER grants to HDREPAIR the non-exclusive privilege of displaying or otherwise using the VIZIO name and those trademarks, service marks, logos, trade dress, and other intellectual property rights ("Marks") as are specified in the Marks Addendum attached hereto as Exhibit C (as such Addendum may be revised by CUSTOMER from time to time), in connection with the selling and servicing of Products.   HDREPAIR agrees that it will promptly discontinue the display and use of any and all Marks, and shall change the manner in which any Marks are displayed and used, when and for any reason CUSTOMER requests that it do so.   HDREPAIR may use the Marks only for the purposes stated in this Agreement. HDREPAIR agrees that none of the Marks may be used as part of HDREPAIR's name or the name under which HDREPAIR's business is conducted without the prior written consent of CUSTOMER.

(c)     Upon the termination of this Agreement for any reason, HDREPAIR agrees that it shall immediately: (i) discontinue the use of the word "VIZIO" and the Marks, or any semblance thereof, including without limitation the use of all stationery, name badges and other material referring in any way to the word "VIZIO" or bearing any of the Marks; and (ii) cease representing itself as an authorized service provider for the Products.

     (d)    CUSTOMER represents and warrants that CUSTOMER has secured the rights to utilize the Marks for the purposes identified in this Agreement and CUSTOMER has been duly authorized by VIZIO to grant the rights granted under this Section 5 to HDREPAIR and to enter into and perform under this Agreement in accordance with its terms.   HDREPAIR and CUSTOMER acknowledge that VIZIO, as the owner of the Marks, shall have the exclusive right, title and interest in and to any and all common law trademarks and registration rights arising out of the use by HDREPAIR of the Marks under this Agreement.

     6.    **Web Portal License.**  Subject to, and in consideration of, the provisions, terms and conditions of this Agreement, HDREPAIR hereby grants to CUSTOMER during the Term a non-exclusive, non-transferable license to use the software application accessed through the HDREPAIR Internet Web portal, at www.hdrepair.com or any successor or replacement thereto (the "Web Portal"), that will act as a conduit for the delivery of the Services to CUSTOMER via the Internet.   At no time shall CUSTOMER copy, transfer, or provide access to reports or other Confidential Information stored in or accessed through the Web Portal to any affiliate, consultant or third party.   The Web Portal shall only be used by CUSTOMER and by persons within or engaged by CUSTOMER having a need to know for the purposes permitted hereunder. CUSTOMER acknowledges that the Web Portal and all information accessible or contained therein is proprietary information of HDREPAIR, under copyright, and CUSTOMER has been furnished access to such data in trust. CUSTOMER acknowledges that the information is a valuable commercial product, the development of which has involved the expenditure of substantial time and money. CUSTOMER will issue appropriate instructions to all of its employees having access to the Web Portal concerning the restrictions contained herein, and shall initiate strict security measures to prevent the accidental or otherwise unauthorized use or release of the data accessible through the Web Portal.   CUSTOMER shall acquire no proprietary rights in or to the Web Portal or any information or data contained therein, which rights remain in HDREPAIR.

     7.    **Representations and Warranties of HDREPAIR.**

     (a)    The execution and delivery of this Agreement by HDREPAIR and the performance by HDREPAIR of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of HDREPAIR.   This Agreement constitutes a valid and binding obligation of HDREPAIR enforceable in accordance with its terms.

     (b)    The entering into and performance of this Agreement by HDREPAIR does not and will not violate, conflict with or result in a material default under its articles of incorporation or by-laws or any other contract, agreement, indenture, decree, judgment, undertaking, conveyance, lien or encumbrance to which HDREPAIR or any of its affiliates is a party or by which it or any of its affiliates or any of its or any of its affiliates' property is or may become subject or bound.

     8.    **Representations and Warranties of CUSTOMER.**

(a)     The execution and delivery of this Agreement by CUSTOMER and the performance by CUSTOMER of the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on the part of CUSTOMER.  This Agreement constitutes a valid and binding obligation of CUSTOMER enforceable in accordance with its terms.

(b)     The entering into and performance of this Agreement by CUSTOMER does not and will not violate, conflict with or result in a material default under its certificate of incorporation or by-laws (or comparable governing instruments with different names) or any other contract, agreement, indenture, decree, judgment, undertaking, conveyance, lien or encumbrance to which CUSTOMER or any of its affiliates is a party or by which it or any of its affiliates or any of its or any of its affiliates' property is or may become subject or bound.

9.     **No Other Warranties**.  EXCEPT AS EXPLICITLY SET FORTH IN THIS AGREEMENT, INCLUDING SECTIONS 7 AND 8, NEITHER PARTY MAKES TO THE OTHER ANY WARRANTIES OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE.  TO THE EXTENT A PARTY MAY NOT UNDER APPLICABLE LAW DISCLAIM ANY IMPLIED WARRANTY, THE SCOPE AND DURATION OF SUCH WARRANTY SHALL BE THE MINIMUM PERMITTED UNDER SUCH LAW.

10.     **HDREPAIR's Responsibilities.**  During the term of this Agreement, HDREPAIR shall maintain (i) Worker's Compensation insurance prescribed by the law of the State in which services are to be performed pursuant to this Agreement; (ii) comprehensive automobile liability insurance with a combined single limit per occurrence of at least $1,000,000; and (iii) "all risk" liability insurance with limits of at least $1,000,000.

11.     **CUSTOMER's Responsibilities.**  In the course of HDREPAIR's performance of the Services, CUSTOMER, in consultation with HDREPAIR, shall determine which new or replacement equipment parts, if any, are required for HDREPAIR to perform the Services (the "Parts").  CUSTOMER shall provide Parts to HDREPAIR using the commercial carrier of CUSTOMER's choice to ship the necessary Part(s) to HDREPAIR at the applicable CUSTOMER location.  If the wrong or a defective part is shipped to HDREPAIR by CUSTOMER and such shipment causes HDREPAIR to make an additional call or calls to the CUSTOMER location, all such additional calls will be billable to CUSTOMER.

12.     **Term and Termination.**

(a)     This Agreement shall be for an initial term commencing as of the date of this Agreement and terminating on the first anniversary hereof.  The initial term will be extended automatically for successive one (1) year extension terms unless either party provides written notice to the other at least sixty (60) days prior to the end of the initial term or any extension term that it does not desire that the Agreement renew. The initial term and all extension terms shall collectively be referred to as the "Term."

(b)     This Agreement shall be terminable for a material breach of the Agreement that the breaching party has not made good faith efforts to cure within a period of fifteen (15) days from written notification of the breach, or that in fact remains uncured in any event for a period of sixty (60) days from written notification of the breach.

(c)     Either party shall have the right to terminate this Agreement at any time and for any reason by delivering prior written notice to the other party, such notice shall be the greater of (i) sixty (60) days, or the length of any current Discount Period then in effect.

13.     **Confidentiality; Non-Solicitation.**

(a)     Each party acknowledges that the other party, both during and after the term of this Agreement, will obtain secret and confidential information concerning the business of such other party and its affiliates, including, without limitation, trade secrets (as defined in the Florida Uniform Trade Secret Act), client lists, Service Representative information, computer software (both source and object code), programmer's notes or instructions, software design flow charts, processes, know-how, discoveries, improvements, inventions, methods, techniques, formulas, compositions, compounds, projects, developments, plans, strategies, forecasts, budgets, projections, research data, financial data, sales data, payroll information, personnel data and CUSTOMER data (the "Confidential Information").

(b)     Neither party shall at any time, either during the Term of this Agreement or thereafter, divulge to any person or entity any Confidential Information or deliver or permit any person or entity to obtain any materials embodying or containing any Confidential Information ("Confidential Materials") except (i) when required in the course of performing such party's duties hereunder, (ii) with the prior written consent of the other party or (iii) where required to be disclosed by court order, subpoena or other government process.   If either party shall be required to make disclosure pursuant to the provisions of clause (iii) of the preceding sentence, such party shall promptly notify the other party of such court order, subpoena or government process.   At the other party's expense, the disclosing party shall (x) take all reasonably necessary steps required by the other party to defend against the enforcement of such subpoena, court order or other government process and (y) permit the other party to intervene and participate with counsel of its choice in any proceeding relating to the enforcement thereof.

(c)     Each party recognizes and agrees that the Confidential Information is a valuable, special, and unique asset of the other party's business, and if it or the Confidential Materials were to be used by it or any entity engaged in competition with the other party, it would be harmful and detrimental to the interests of the other party.   Each party agrees that, during the Term of this Agreement and therafter, it shall not make use of any Confidential Information or any Confidential Materials for its own purpose or for the benefit of any other person, firm, or other entity.

(d)     Upon the termination or other expiration of this Agreement, each party shall promptly deliver to the other all Confidential Materials which it may then possess or have

under its control and the confidential obligation shall survive and bind the parties for two (2) year after the termination or expiration.

14. **Nonsolicitation.** Each party agrees not to employ or retain (or offer to employ or retain) the services of any officer, employee, independent contractor or agent then employed or retained by the other party or its affiliates or induce, encourage, or solicit any such officer, employee, independent contract or agent to leave the employment or service of the other party during the term of this Agreement and for one year thereafter. CUSTOMER agrees that it shall not directly or indirectly (i) employ or retain any Service Representative other than as provided in this Agreement, (ii) disclose or provide Service Representative information to any third party, or (iii) otherwise use the services of any Service Representative who is or has provided services to CUSTOMER from HDREPAIR through any third party service provider.

15. **Remedies.** Each party acknowledges that (i) any breach of the provisions of Sections 13 or 14 of this Agreement will cause substantial and irreparable harm to the other party for which the other party would have no adequate remedy at law thereby entitling the other party to seek injunctive or other equitable remedies in the event of such breach without proof of irreparable harm or the posting of a bond and (ii) the provisions of this Agreement are reasonable and necessary for the protection of the business of the other party and its affiliates. In addition, should either party prevail in any action, suit or other proceeding to prevent or restrain a breach or threatened breach by the other party of this Agreement (whether such proceeding is brought at law, in equity or otherwise), the non-breaching party shall be entitled to collect from the breaching party the reasonable costs and expenses incurred by the non-breaching party in connection with such proceeding, including but not limited to court costs and reasonable attorneys' fees. The agreements and covenants made by the parties in, and the obligations of the parties under Sections 12 and 13, shall survive the termination of this Agreement. Each such agreement and covenant by the parties shall be construed as being independent of the other provisions herein, and the existence of any claim or cause of action by one party against the other shall not constitute a defense to the enforcement of any such covenant or agreement.

16. **Limitation of Liability.** EXCEPT WITH RESPECT TO BREACHES OF SECTIONS 13 OR 14, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF PROFITS) ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT AND UNDER ANY THEORY OF LIABILITY, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

17. **Indemnity.**

(a) Each CUSTOMER agrees to protect, defend, indemnify and save harmless HDREPAIR, its officers, employees, affiliates and representatives, from and against any and all expenses, damages, claims, suits, actions, judgments and costs whatsoever, including reasonable attorneys' fees, arising out of, or in any way connected with, any claim or action alleging that the

use of any Mark in connection with the Services violate the intellectual property rights of any third party, any bodily injury or property damage arising out of an occurrence allegedly caused by a defect or failure to warn of a defect in design, manufacture or assembly of any Product by CUSTOMER, and any breach by CUSTOMER of any statutory or regulatory law or order, or any representation or warranty hereunder.

(b)     HDREPAIR agrees to protect, defend, indemnify and save harmless CUSTOMER, and their respective officers, employees, affiliates and representatives, from and against any and all expenses, damages, claims, suits, actions, judgments and costs whatsoever, including reasonable attorneys' fees, arising out of, or in any way connected with, any claim or action for any alleged infringement by HDREPAIR of any copyrights, trademarks, ,patent, design rights, or other proprietary rights of any third party, and any breach by HDREPAIR of any statutory or regulatory law or order, or any representation or warranty hereunder.

18.     **Force Majeure.**   Neither party shall be responsible for any failure to perform due to unforeseen circumstances or to causes beyond its control, including but not limited to acts of God, war, terrorism, riot or embargoes; acts of civil or military authorities; fire; floods; accidents; strikes; shortages of transportation facilities, fuel, energy, labor or materials; or failures of telecommunications or electrical power supplies.   A party whose performance is affected by a force majeure condition shall be excused from such performance to the extent required by the force majeure condition so long as such party takes all reasonable steps to avoid or remove such causes of nonperformance and immediately continues performance whenever and to the extent such causes are removed; provided, however, that either party may terminate this Agreement on five (5) days written notice if performance is excused hereunder for a period of sixty (60) days.

19.     **Assignment.**   Neither party shall assign this Agreement, in whole or part, without the prior written consent of the other party except that either party may assign this Agreement in its entirety to its parent company, any subsidiary in which it holds a majority voting interest, or to its successor in connection with a merger, reorganization or sale or transfer of all or substantially all of the business, or part of the business, to which this Agreement relates. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.   The making of an assignment permitted hereunder shall not relieve the party making such assignment from any of its obligations hereunder.

20.     **Notices.**   Except as otherwise provided in this Agreement, notices required to be given pursuant to this Agreement shall be given in writing and shall be effective (a) upon hand delivery, (b) one business day following deposit with a nationally recognized overnight delivery service, charges prepaid, or (c) three days following deposit with the United States Postal Service, certified mail, postage prepaid, to the parties at the addresses set forth on the signature page hereof or such other addresses as the parties may designate by proper notice.

21.     **Waiver.**   Failure by either party to insist upon the strict compliance with any of the terms, covenants, provisions or conditions of this Agreement shall not constitute a waiver or relinquishment of such right or power at any other time or times.

{Client Files\H122\002\00031048.DOC V7}

22.   **Entire Agreement.**   This Agreement, and the Exhibits attached hereto, constitute the entire agreement between the parties hereto with regard to the subject matter hereof and supersedes all prior oral and written discussions and understandings.   This Agreement may be amended only by a written instrument signed by both parties, provided, however, that Service Appendix 1 may be modified or amended by HDREPAIR within sixty (60) days prior to the end of any Term and Service Appendix 2 may be modified or amended by HDREPAIR at its sole discretion.

23.   **Interpretation, Enforcement and Severability.**   Each and every provision of this Agreement shall be interpreted and enforceable to the fullest extent allowed by applicable law.   Should any term, provision, clause, covenant or condition herein be declared wholly or partially invalid or unenforceable by any Court or be thereby amended, the remaining whole, partial or amended terms, provisions, clauses, covenants and conditions shall be fully enforceable at law or equity.

24.   **Survival.**   The terms and conditions of Sections 3, 4, 5(c), 5(d), 9, 13, 14, 15, 16, 17, 18, 20, 23, 24, 25, 26 and 27 shall survive the expiration or termination of this Agreement and shall be binding on the parties, their successors and permitted assigns.

25.   **Failure to Pay Fees.**   If any action is brought by HDREPAIR to recover any fees due to HDREPAIR under this Agreement and HDREPAIR substantially prevails in such action, HDREPAIR shall be entitled to recover from CUSTOMER, in addition to the unpaid fees, its reasonable attorneys' fees and costs incurred in connection with such action.

26.   **Dispute Resolution.**   Except as otherwise stated herein, on the written notice of either party requesting application of this Section 26, all claims and disputes arising out of or relating to this Agreement shall be resolved according to the following procedure:

(a)   First, all such disputes shall be mediated by a mediator to be selected by mutual agreement of the parties. The mediation shall take place in Dallas, Texas.   In the event the parties cannot agree on a mediator within fifteen (15) days of the receipt by either of written notice of the other requesting application of this Section 26, then each party shall designate a party within fifteen (15) days thereof by written notice to the other. Within fifteen (15) days thereof, the two parties selected then shall mutually designate a mediator for mediation of the dispute. The mediation shall continue from time to time until the dispute is resolved or the mediator has made a determination in writing that the dispute cannot be resolved through mediation and arbitration is recommended, provided that mediation may be terminated by either party upon fifteen (15) days notice given at any time on or after the sixty-first (61st) day after notice requesting application of this Section 26. The mediator shall recommend one or more arbitrators to the parties.

(b)   Second, upon (i) a written determination by the mediator that arbitration is recommended, and (ii) written request within ten (10) days thereafter by either party, the dispute shall be submitted to arbitration under the Commercial Arbitration Rules of the American Arbitration Association (the "AAA"), before an arbitrator to be selected by the parties, to be held

in Dallas, Texas. If the parties cannot agree on an arbitrator within ten (10) days of one party's notice to the other party invoking the right to arbitrate, then the AAA shall appoint an arbitrator who has significant experience in arbitrating matters similar to the subject matter disputed under this Agreement. The arbitration shall commence not less than ten (10) nor more than thirty (30) days after the arbitrator has been. designated. The arbitration shall be concluded as soon as reasonably possible, and the arbitrator shall make a written determination of the dispute within fifteen (15) days of the completion of the arbitration hearing. The prevailing party in any such arbitration shall be awarded reasonable attorneys' fees, expert and nonexpert witness costs and expenses and other costs and expenses incurred in connection with such arbitration, unless the arbitrator, for good cause, determines otherwise. Costs and fees of the arbitrator shall be borne by the non-prevailing party, unless the arbitrator determines otherwise. The arbitrator's adjudication shall be final and fully binding upon the parties and enforceable in any court having jurisdiction thereof.

27. **Governing Law; Venue; Waiver of Jury Trial.** This Agreement shall be governed by, subject to and construed in accordance with the laws of the State of California without regard to its conflict of law provisions. Subject first to Section 26, in all court proceedings arising out of or brought in connection with this Agreement, the parties hereto irrevocably consent to exclusive personal jurisdiction by, and venue in, the Courts of the City of Los Angles, California and the United States District Court for the Southern District of California. To the fullest extent permitted by law, the parties each knowingly, voluntarily and intentionally waive any rights they may have to a trial by jury with respect to any claim, suit, motion for judgment or legal proceeding arising out of, under, or in connection with this Agreement.

28. **Counterparts.** This Agreement may be executed in one or more counterparts, each of which taken separately shall be deemed an original and all of which taken together shall constitute one and the same agreement.

**[SEE NEXT PAGE FOR SIGNATURES]**

{Client Files\H122\002\00031048.DOC V7}

IN WITNESS WHEREOF, the parties have affixed their signatures as of the date first set forth above.

HDREPAIR.COM CORPORATION

By: _____
Clarissa Roxberry, President
4199 North Dixie Highway
Unit # 5
Boca Raton, FL 33431
EIN: 26-3242507

AmTRAN TECHNOLOGY COMPANY, LTD.

By: _____
Print Name: _____
Title: _____
14330 Monte Vista
Chino, CA   91710
EIN: _____

ASEV DISPLAY LABS

By: _____
Print Name: _____
Title: _____
Address: _____
_____
EIN: _____

**Page 93 of 108**

EXHIBIT A

*SERVICE APPENDIX 1
HDREPAIR POLICIES & PROCEDURES

Upon the request of CUSTOMER in the manner further described herein, HDREPAIR shall render prompt, workmanlike, courteous and willing service on all Products.

**1. OEM Service Provided:**

A.  Manufacturers Warranty Support.

1.  Onsite service repair within 2-4 business days of receipt of replacement parts

2.  Help Desk Support for the Service Representative to maintain high repair ratio

3.  HDRepair Hours of operation 8.00am-10.00pm Monday-Friday and 10.00am-6.00pm Saturdays EST

4.  Service Representative contracted hours 8.00am-8.00pm Mon-Sat local time

5.  Accommodating to the end users schedule

B.  Service Ticket Management - Consisting of calling the end user within 4 hours of dispatch of onsite service request and being onsite within 3-4 days.

C.  Web Access – Direct web access allowing for live, real time data, performance reporting, and direct call updating capabilities for customer.

D.  Service Representative Management – One on one relations with every service Vendor allowing for constant direct communication.

E.  Customized Performance Reporting – Measure every aspect of your service call; performance metrics, SLA compliance, and Open Call management.

F.  Installation Services- Professional installing and removing flat panel from the wall.

G.  Depot Service -

1.  Depot Repair facilities at East coast location – To reduce shipping costs, depot service can be provided to diagnose, repair, and return units quickly with continuous updates to the end user.

H.  Preventive Maintenance Services- We run through a complete battery of tests, checking everything from parts, connectors, and clean dust and debris out of the flat panel's vents and speakers with a soft cloth.

I.  Diagnosis Service – Service Representative can go onsite to Diagnose and Trouble shoot

**2. Service Call Management:**

A.  Dispatch Process

1.  Customer dispatches onsite service request to HDRepair

{Client Files\H122\002\00031048.DOC V7}

2. Service Request is imported – At this point call is viewable for customer and Service Representative to see and update on website.   Service request is assigned to Vendor based on the End User lõcation and Vendor skill set.

3. Database is queue driven; call is placed in First Contact queue.   First contact completed 4 business hours from import

4. Upon receipt of allocated part airbill, and confirmation of part shipment, call is moved to Need Appt queue, Vendor is to call End User to schedule service

5. With appointment set, call is in Ready for Service queue, Vendor calls the morning of appointment to confirm

6. Upon arrival to site, Service Representative calls HDRepair to log onsite

7. Service Representative calls tech support if call is not repaired

8. Closes call onsite live time with HDRepair

## 3. Quality Assurance:

A. Perform Onsite Survey – For Every onsite service call a survey would be performed over the phone to determine the End User's satisfaction with service.   Survey consists of:

1. End User satisfaction on 1-10 scale

2. Is the unit repaired? Y/N (If no, next step is explained to end user)

3. Is there any damage to the unit

4. Is the workspace as it was upon Vendor arrival

B. A "Leave Behind Document" is left with the End User to allow for any issues the end user may want to address after the vendor has left site via phone call or email.

C. Weekly or monthly statistical data can be gathered to measure performance based on surveys.

## 4. Service Representative Administration:

A. Build Personal Relationship with Service Representative – talk on a daily basis.

B. Daily Status Reports on Open Service Requests by 10.30am local time.

C. First Contacts.

D. Maintains Weekly Performance Communication.

E. Monitor Certification Status.

F. Parts Logistics Management – Track all incoming and outgoing parts.

G. Mediate Communication Between Service Representative and End User.

## 5. Customer Service

A. Customized Proprietary Database - HDRepair has developed a proprietary stand-alone software system to assist in Problem Management for our customers.

B. Service Call Tracking - Which captures all progress of the service request on a daily basis. Service requests are monitored to ensure that all policies and procedures/call requirements are being fulfilled. Actions are taken if there in a tech delay or an end user delay.

C. Problem Tracking - Is a process that assigns work tasks and escalations. It captures who, when, due date and status. Statistics are gathered, reported and historical data is captured.

D. Fault Management - Which assists in the detection, isolation and prevention of process errors.

E. Weekly Performance Reports on Days to Close.

F. Dedicated Account representative on Call 24/7.

## 6. Help Desk Services:

A. Third Level Hardware Support Services for Service Vendors.

B. Field Support and Training – With manufacturer product focus, our help desk can ensure the field is properly trained to provide high repair ratio's. No Vendor would be dispatched on a call without passing a certification test in the product being repaired.

## 7. Business Solutions:

A. Project Management - We are capable of handling large or small special projects nationwide. Whether it be a large number of installs/repairs at one location, or one client in multiple locations.

B. Installation and Repair Clinics – One location for product recall corrections.

### SERVICE APPENDIX 2
### SERVICE REPRESENTATIVE POLICIES & PROCEDURES

## 1.0 Field Policies/Procedures

### 1.1 General Requirements

❖ All Field Technicians are REQUIRED to have a cellular phone with voice mail with them at all times.   All Field Technicians are on call within the required times of each customer. HDREPAIR recognizes the following holidays: New Year's Day, Labor Day, Memorial Day, Independence Day, Thanksgiving Day, and Christmas Day.

❖ Field technicians are not to take equipment off-site unless either the customer company sends an RMA box to ship the system back, or the technician is instructed by an authorized representative of the customer company and HDRepair to take the equipment offsite.   In this event, be certain to document the technician's name that authorized you to take the equipment offsite.   HDRepair must be made fully aware of this process prior to the occurrence.

❖ Field Technicians are not to solicit end user for additional services, nor accept any offers from the end-user to pay for additional services, for any reason. If a Field Technician offers to sell services or products to an end user, or if for any reason the Field Technician makes a derogatory statement about a customer or end-user, or a customer or end-user's products or services, the Field Technician will immediately be separated from any relationship with HDREPAIR. This sort of action places all of our business in jeopardy and cannot be tolerated. If these actions have occurred, Field Technician may be charged for the cost of the new system.

❖ Unless approved by HDREPAIR prior to arriving onsite, Field Technicians are not authorized to bring any additional persons onsite while making a service call. Only Field Technicians contracted by HDREPAIR are to be involved in service calls.

❖ Customer names and trademarks are proprietary and may not be used for any purpose without the specific permission of the trademark owners.

❖ Reimbursement for work is a pre-negotiated between the Service Representative and the HDRepair. Payment does not include trip charges or taxes, unless specifically authorized by HDRepair rep. The authorization for any additional costs must be submitted and approved prior to performing service. At not time should payment matters be discussed with the Customer for the client of the Customer.

❖ All information regarding HDREPAIR customers and their customers is confidential and may not be used for any purpose without specific written authorization by HDREPAIR executive management.

**1.2 Prior to Onsite Service**

❖ Calls are dispatched throughout the day and are posted to the HDREPAIR website as they arrive. The Field Technician is to download the work order from the HDREPAIR website. The Field Technician must be sure that he or she understands the requirements of the work order. If the job description is unclear, the Field Technician should ask for clarification. Instructions on work orders are to be carefully followed.

❖ Field Technicians are to contact end-users within 24 hours of receipt of the service call.

❖ There is a requested date for service on each work order. The requested date is usually the estimated part arrival date. It is imperative that appointments be scheduled for service on the requested date. The Field Technician is not to wait for the delivery of the parts before scheduling an appointment.

❖ For service calls with parts shipped directly to the Field Technician on a regular basis, it is best to open an account with The UPS Store, Mailboxes Etc, or something similar or use your commercial address.

❖ Unless the purpose of the service call is to diagnose a system problem, install or uninstall components, or to perform preventative maintenance, there is a part for every call, shipped either to the Field Technician or to the end-user. This process is detailed on the work order and in the item procedures and varies by client. Most parts can be identified either by the end-user name on the packing slip and the reference number or by the service order (S.O.) number from the work order.

❖ Any additional charges or expenses incurred by the Field Technician in the process of completing a call will not be reimbursed unless HDREPAIR has granted approval prior to or during the Field Technician's onsite visit, regardless of any statement from the customer or client.

### 1.3 Receiving Parts

❖ If the Field Technician receives parts that have been damaged in any way during shipping, HDREPAIR should be contacted immediately or the Field Technician could be held responsible for the cost of the part.

❖ Prior to going onsite the Field Technician will open all parts to be utilized on a service call in order to verify that all correct parts have been received

❖ The Field Technician must open the box of all parts shipped to confirm part shipped matches part stated in Problem Description and Inbound Part Information of the work order.   Failure to do so could result in non-payment for service call if the parts sent are incorrect.

❖ If a part is lost or misplaced and needs to be reordered for any reason due to the negligence of the Field Technician, the Field Technician may be charged for the part.

### 1.4 Updates

❖ An update is specific information that allows HDREPAIR to track the status of a call.   An update will advise your administrator if parts have arrived, if there is a no-contact situation, or of any circumstance preventing the timely completion of the call.   These updates are vital to our service contracts.   Updates should be clear, concise and to the point.   We need recent, factual information describing all steps taken on a daily basis, excluding Sundays and certain holidays, for every call.

❖ HDREPAIR will maintain a list of each Field Technician's open calls on the HDREPAIR website.   Field Technicians are expected to submit their call updates directly to this site at least once a day, preferably by 11:00am, local time.   It is of the utmost importance that the Field Technician keep HDREPAIR updated, via telephone or via the HDREPAIR Vendor Website, as to the status of **each call**, every day.

❖ Back-ordered parts, no response from an end-user, and other extenuating circumstances may delay a call for closure.   Such situations occur from time to time and require additional communication.   Make sure all end-users are aware of any part delays.   If messages have been left for an appointment with the end-user for 2 consecutive days with no response, notify your HDREPAIR administrator.   He or she will attempt contact with the end-user and/or will request another contact number from our customer.   The sooner we have the update information, the sooner we can get the call serviced and closed, the better our numbers for service completed are.   Better numbers equals more business.

❖ HDREPAIR's goal is to service the end-user within 2 business days (16 business hours) from the delivery of the part.

### 1.5 Onsite Procedures

❖ When arriving on-site, be punctual, and identify yourself as the Field Technician.

❖ Field Technicians are to dress in business attire. A dress shirt, or a collared shirt must be worn.   Slacks or khakis (such as Dockers) are acceptable, and a polo or button down shirt. For women, skirts and heels are acceptable but not recommended due to the physical nature of the work.   No shorts, t-shirts or sneakers are to be worn to end user/customer site.

❖ THERE MUST BE AN ADULT 18 YEARS OF AGE OR OLDER ONSITE AT ALL TIMES!  If a Field Technician arrives onsite and cannot confirm the presence of an adult, he/she should not enter the premises.   HDREPAIR should be notified immediately and the call is to be closed.   (If the only adult 18 years of age or older must leave site, leaving no adults onsite, the Field Technician must leave immediately as well.)

❖ It is not recommended that service calls be performed outside the working Technical Support hours of the company for which the service call is to be run.   Hours are posted on each work order for each item.   If a call must be run outside these hours in order to keep up with the workload, be sure not to miss any essential details as stated in this procedure manual, so as to avoid your returning to the end user's site.

❖ Under no circumstances should any Field Technician perform service without taking a work order onsite.   All work orders must be signed and dated by the end-user as evidence of service performed.

❖ Do not place equipment directly on tabletops or countertops, potentially scratching those surfaces.   It is highly recommended when moving the equipment to carry and utilize an Anti Static Mat or Service Kit.   This prevents most allegations of damage against the Field Technician.   Field Technicians should put the equipment on a flat surface, on top of the mat, to perform the repair.   By simply removing the system from a small, cramped area and placing the mat underneath it, the chance of scratching any furniture is greatly reduced. Also, Field Technicians should look at the work area and point out pre-existing conditions to the end user, (i.e. scratches or dents to the counter or tabletop, spots or tears in a rug) to HDREPAIR, and to HDREPAIR' customer upon call closure.

❖ When performing any service call, report serial numbers, model numbers, manufacturer type, any problem discovered, problem resolution, and part numbers needed.   This information must be documented in your paperwork for later reference.

❖ Under no circumstances are we to imply, state, suggest, or make any reference to replacing the end user's equipment, no matter what the state of that equipment.   It is the manufacturer's exclusive right to choose whether to replace an entire system.   As far as we are concerned, every equipment system can be repaired if necessary – even if every single component would need to be replaced for that to happen.   If an end user replaces his or her equipment based on the advice of a Field Technician, the Field Technician may be charged for the cost of the new system.

❖ If a work order is issued, we assume the system is under warranty; it is not our position to determine the status of the end user's system with respect to warranty coverage.   The work order obligates us to complete the service intended.

{Client Files\H122\002\00031048.DOC V7}

### 1.6 Pre-Service Equipment Check

❖ Upon arriving on-site, ensure that all proper ESD (electrostatic discharge) precautions are taken before either handling parts outside of static bags or working on the end user's system. Technicians must take proper anti-ESD precautionary measures, including wearing an anti-ESD wrist strap, at all times while working on electronic equipment. HDREPAIR and/or our clients may, at our discretion, inquire of end-users as to whether proper anti-ESD precautions, including anti-ESD wrist straps, were used during the repair.

❖ Ensure that the serial number on the work order matches the serial number of the machine being worked on.   The serial number can be listed either in the serial number field, or in the problem description of the work order.   If there is no serial number listed, please call tech support immediately.

❖ Verify that the end user's equipment trouble has been reported correctly.   All service calls require the Field Technician to test the equipment, including investigation of the stated problem(s), prior to the start of part replacement (i.e., no power, no sound, etc.).   The Field Technician shall contact HDREPAIR immediately if the end user's equipment is "tampered with" upon arrival.

❖ Prior to attempting a repair, verify proper AC wall voltage at the outlet(s) providing power to the equipment being serviced. Document the following voltages: Hot-to-Neutral, Hot-to-Ground, and Neutral-to-Ground. Have these voltage readings available upon request by closing and/or Tech Support agents.

### 1.7 Repairing the Equipment

❖ Exchange parts as required by the trouble ticket for the service call.   Make sure standard static prevention procedures are followed.   If the new parts sent do not repair the equipment, or if parts are DOA (part sent is defective, physically damaged and/or unusable), contact Tech Support at the appropriate support numbers.   If the parts sent are not sufficient to repair the equipment, the Field Technician is required to work with the Technical Support personnel from the customer company to attempt to diagnose the system failure(s).

❖ If no parts are required to service the end user's equipment or peripheral, or if the service call is to diagnose the EQUIPMENT, the Field Technician shall assess the system problem and inform the appropriate Technical Support Center of the diagnosis.

### 1.8 A Non-Repair Situation

❖ If any replacement parts sent to the Field Technician do not work and are determined by Technical Support personnel to be DOA (Dead On Arrival), the Field Technician shall re-install the original part in the end-user's unit and return the DOA part.   That DOA part is the core part and MUST be returned.

❖ Remember that initially the manufacturer troubleshoots the problem on the phone with the end-user.   Based on this diagnosis, the manufacturer assigns the parts to be used on the initial visit to the end user's site.   If a Field Technician arrives at the site and concludes that a misdiagnosis has occurred, do not "point the finger" at the manufacturer.   However, if necessary, it is appropriate to explain this procedure to the end-user.   Assure him or her that we will rectify this problem as soon as possible and make sure all necessary parts are ordered

{Client Files\H122\002\00031048.DOC V7}

for the next visit.   Make it right by requesting the right parts when the problem is diagnosed -- not by blaming the misdiagnosis on someone else.   After all, not all problems can correctly be diagnosed over the phone, especially since most end-users have limited experience in performing equipment troubleshooting.

❖ Offer the solution first.   Always explain what you CAN do, and avoid explaining the negative side of the situation.   Make sure the end-user understands what is being done for his or her system.

❖ Under no circumstances are we to convey to the customer a lack of knowledge concerning any procedures or questions they may ask.   If you do not understand a procedure or customer request and are unsure how to respond or proceed, contact HDRepair for assistance. In such circumstances, we suggest advising the end-user that our contract requires the technical support personnel to provide step-by-step support throughout the entire service call, and that any technical questions should be referred to them.

**1.9 Closing Procedures**

❖ While still at the end-user's site, the Field Technician shall contact the appropriate support numbers stated on the work order with the closeout information requested on the work order. All calls must be closed from the end-user's site.   Customer agents may ask to speak with the end-user to confirm that the service call was completed to his or her satisfaction.

❖ All work orders must be signed and dated by the end-user as evidence of service performed and are subject to audit by HDRepair.

❖ It is highly recommended that for every work order received, the sender's copy of the return airbill be stapled to the work order and filed.   Even for cancelled calls, the return airbill must be documented.

❖ The Field Technician is required to return all unused and/or used (varies per customer) replacement (core) and DOA parts in the original box to the address on the prepaid return airbill (or as defined in the package), unless the work order specifically states that parts should remain onsite.   Please be 100% sure you are placing the appropriate part in the corresponding return box with the correct return airbill.   Mismatching parts and return airbills may result in a charge for the part due to improper part return.   All parts must be accounted for.   The Field Technician is to contact the designated shipping company and arrange for pickup or will take part(s) to designated drop off locations for return within 48 business hours of call closure.   In the event that a part, whether used or not, is designated as "consumable" and is not to be returned, the Field Technician shall keep the part in his or her possession until the service call for which the part was sent has transferred into Billing status, or for a minimum of 2 weeks, whichever comes last.

❖ In all instances when a return airbill is included with a part, that airbill should be the one used when returning parts.   For many customers, the return airbill numbers are pre-recorded and are required to expedite the closeout process as well as to ensure that technicians are credited as having returned core parts from service calls.   If the parts are not returned on this pre-recorded airbill, a part charge is still incurred as per the warranty company, the part has not been returned.

❖ Parts shipped to the end user site are the Field Technician's responsibility to return unless otherwise stated on the work order.

## 2.0 Returning Parts

❖ All parts must be returned immediately upon completion of the service call. The regulations on part returns vary per customer. Nonetheless, after 2 business days, PARTS MUST BE RETURNED OR CHARGES MAY APPLY.

❖ Parts must be returned in their original package and must be shipped in the same manner they were received. If each part was shipped separately, each part must be returned separately. Conversely, if multiple parts were shipped together in the same package, return parts must be shipped the same way.

❖ When packing parts for return, make sure that each individual component is wrapped in protective packaging. Placing circuit boards directly on top of each other without protective packaging damages the components.

❖ Fill out all accompanying paperwork. This allows the receiver of the part to correctly identify the part, which service call the part was used for, and if the part can be used again.

❖ In all cases, the RMA# and customer # from work order should be visible on the return airbill in the reference field and on the outside of the box.

❖ HDREPAIR does not pay for any call without a return airbill that tracks as delivered to the correct location. Returning parts is the last step in the completion of service calls. If you are unsure of any portion of the parts return process, contact your administrator.

## 3.0 Closing Codes

The codes explained below represent HDREPAIR's standardized notation used when closing each call. Please make sure to use this uniform system, as these codes directly influence the billing and evaluation processes.

### 3.1 Payable Service Calls

- **REPAIRED:** This is used when a service call has no problems; parts may have been used, and the end user's system is fully functional. No additional action is needed.

- **COMPLETE:** This is used when an onsite service has been provided, but unit cannot be repaired due to circumstances outside of our control. (i.e. source issue, panel issue, wiring issue, damaged unit)

- **DIAGNOSED:** This is used for a completed diagnostics work order. Additional action is expected.

- **MISDIAGNOSED/REORDER:** This is used when the part ordered is not the part needed to fix the problem. This determination must be confirmed with the respective Technical Support department before closing. There is a high probability of another service order resulting from this call.

- **ADDITIONAL PROBLEMS FOUND:**   Another unrelated problem has been discovered since the Field Technician has arrived onsite.   Alternatively, more parts may be required due to cascading failures (for example, a failed CPU fan causing the CPU to fail due to overheating).

- **WRONG PART SENT:** This is used when the part ordered is of lesser or unequal quality, size or Standard, or if the part the wrong item entirely.   To ensure that and incorrect part is not send again, the field technician should provide tech support with the part number of the correct part needed.

- **DEAD ON ARRIVAL:** This is used when the part sent is defective or physically damaged and is, as a result, unusable.

- **PRTN:** This is used to bill for an administrative service fee for a call that is cancelled after the technician receives the part.   (PART RETURN)

- **END USER FAILURE:** This is used when the Field Technician is unable to service a system or work on a machine due to an end user and/or customer failure/error.   A typical situation would be a non-matching serial number or model number, incorrect address information, or for whatever reason end user is refusing service.

- **END USER MISSED APPT:** This is used when a Field Technician arrives on site at the appointed time and the end user is not there.   The following procedures must be strictly followed or the call will become a non-payable call.

  - **For a call to be closed as a END USER MISSED APPT, the Field Technician is to:**

  - Have a scheduled appointment with the end user, documented with HDREPAIR, and

  - Arrive on site at the appointed time, and

  - Knock on end users door, contact doorman if applicable. Call the end user.

  - It is imperative that you be very thorough in setting up appointment times and verifying the end user's location address.

  - If the end user is not onsite, HDREPAIR must be notified from the vicinity of the site via cell phone or pay phone at the time of arrival.   The Field Technician must document who was spoken to at the customer company's dispatch department.   The Field Technician is to wait 30 minutes for the end user to arrive.   For a call to qualify as a no-show, **the initial call and subsequent call must be made from the end user's vicinity via cell phone or pay phone to close after the appropriate wait time.**

  - Contact HDREPAIR at the expiration of the required wait time and close out the call from the site.

  - Leave a note on the end-user's door stating when the Field Technician was at the site.

- The call will be closed and the Field Technician will be paid.   Field Technicians may be asked to hold on to the parts and commence rescheduling with the end-user.

- **END USER MISSED APPT:** This is used when a Field Technician arrives on site at the appointed time and the end user is not there.   The following procedures must be strictly followed or the call will become a non-payable call.

### 3.2 Non-Payable Service Calls

- **CANCELLED BY END USER:** This is used when service is no longer required (for example, the unit is now working) or the system is sent back to the place of purchase. The call is cancelled by the end-user.   The Field Technician has not visited the site.

- **CANCELLED BY CUSTOMER:** This is used when the customer due to a warranty conflict or similar situation cancels a call.   The Field Technician has not visited the site.

- **DUPLICATE TICKET**: A call is closed as a duplicate of another.

### 3.3 Other Closing Codes

- **MANAGEMENT CLOSING:** HDRepair was not able to cover the call due to remote area and no tech available..

## 4.0 TOOL LIST

The following is a list of tools that every Field Technician must have while onsite. These items are vital to completing all necessary tasks.

- ❖ Cellular phone with voice mail,

- ❖ Phillips, Torx, and plain screwdrivers (assorted lengths and bits. A set of magnetic and nonmagnetic screwdrivers is required.)

- ❖ Small nonmagnetic flat-blade ("tweaker" screwdriver)

- ❖ Digital multi-meter

- ❖ Small needle-nose pliers,

- ❖ Diagonal cutters (wire cutters) *

- ❖ ESD mat, strap and gloves

- ❖ Preventative Maintenance tools:   brush and compressed canned air, small portable vacuum, ground checker for AC outlet, pre-printed hard copies of the Preventative Maintenance Procedure and Checklist. (Available on the HDREPAIR Vendor Website)

- ❖ Electric screwdriver

- ❖ Extension cord

- ❖ Long RCA cable

- ❖ Coaxial cable

- ❖ HDMI cable
- ❖ Component and composite cable
- ❖ Rabbit ears- to test video without eu's components
- ❖ Laptop or DVD player with HDMI input, component and composite video input to test the unit
- ❖ Digital camera
- ❖ A blanket or 5'x6' piece of bubble wrap for TV and furniture protection

## 5.0 Technical Competence

HDREPAIR may require verification that the Field Technician has the competence to perform the work.  HDREPAIR may employ various methods, such as end user surveys, to ensure that work is being performed to the required standards.  All Field technicians must have a valid certification number on file with HDREPAIR.

## 6.0    Warranty and Remedy

The Field Technician will provide a thirty-day (30) warranty on all work, from date of completion of the job.   This warranty will cover any work performed relating to workmanship, quality and performance of the job as specified and billed.   The Field Technician will revisit and correct any work with no charge to HDREPAIR to complete the job as specified and billed. Parts failures are excluded from this condition.   The Field Technician will be liable to HDREPAIR for all damages resulting from a breach of this warranty.

## 7.0    Conduct on End User/Customer Premises

Field Technicians must, at all times, adhere to all customer rules and regulations, whether written or verbal, with respect to safety, security and otherwise.   The Field Technician must not smoke or chew tobacco while on the end-user premises.   The Field Technician MUST WEAR APPROPRIATE BUSINESS ATTIRE, FULLY IDENTIFY HIMSELF OR HERSELF TO THE END-USER AND CONFIRM THAT AN ADULT (INDIVIDUAL 18 YEARS OF AGE OR OLDER) IS PRESENT PRIOR TO ENTERING THE PREMISES.   The Field Technician must enter only those areas of the premises that are necessary for him/her to perform the work intended.   The Field Technician must take all necessary precautions to avoid damage to property or injury to person while on the end-user's premises.   In all events, the Field Technician agrees that information or knowledge obtained from the end user by telephone or while on the end-user's premises shall not be disclosed or discussed with any party other than the end-user or a proper representative of HDREPAIR.   The Field Technician shall treat all information pertaining to the end-user as strictly confidential.   The Field Technician shall not violate any laws while on the end-user's premises.   The Field Technician shall not consume alcoholic beverages for a period of at least twelve hours before entering an end-user's premises, and the Field Technician shall not be in possession of or consume alcoholic beverages on the end user's premises.   The Field Technician shall not have consumed, nor consume while on the end-user's premises, any prescription or nonprescription medications which would be likely to cause

{Client Files\H122\002\00031048.DOC V7}

impairment of judgment or hinder the technician's ability to perform his or her job function in a professional manner.   Violation of any of the provisions in this package shall be cause for immediate termination of the Field Technician's contract or employment.   Notwithstanding any such termination, the Field Technician shall remain liable to HDREPAIR, HDREPAIR' customer companies, and/or the end-user for any damages resulting from a breach of the stipulations contained in this package.

{Client Files\H122\002\00031048.DOC V7}

## EXHIBIT B

### FEE SCHEDULE

OEM Onsite Service Pricing for Flat Panel Repair and Service within the Service Territory:

A.   Service Fees

|  | Below 42"<br>One Tech | 47" and Above<br>Two Techs |
|---|---|---|
| Price Per Call | $125.00 | $175.00 |
| PRTN (Part Return, No Onsite) | $ 25.00 | $ 25.00 |
| Onsite Diagnosis | $ 95.00 | $135.00 |
| Onsite Diagnosis and Repair | $125.00 | $175.00 |

B.   Price Per Call Monthly Volume Discount Service Fee

|  |  |  |
|---|---|---|
| 1000 to 2999 Invoiced Calls/Month | $115.00 | $165.00 |
| 3000 or more Invoiced Calls/Month | $105.00 | $155.00 |

C.   No call is invoiced until part is returned.

D.   Invoices submitted electronically twice monthly for all uninvoiced Service requests completed (i) between the 1st and the 15th of each month, and (ii) between the 16th and the end of each month.   Payment is Due within 15 days of invoice date days via wire transfer to HDREPAIR designated bank account.

**Page 107 of 108**

{Client Files\H122\002\00031048.DOC V7}

EXHIBIT C

MARKS ADDENDUM

{Client Files\H122\002\00031048.DOC V7}